1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   -------------------------------------------------------X

3   MELISSA BASTIAN,

                                        PLAINTIFF,
4
                    -against-              Case No.:
5                                          13 CIV 5972
                                           (ALC)(GWG)
6
    NEW YORK CITY DEPARTMENT OF EDUCATION,
7
                                        DEFENDANT.
8   ------------------------------------------------------X

9

10                      DATE:  August 11, 2014

11                      TIME:  11:30 A.M.

12

13          DEPOSITION of the Plaintiff, MELISSA BASTIAN, taken

14   by the Defendant, pursuant to a Notice and to the Federal

15   Rules of Civil Procedure, held at the offices of the New

16   York City Law Department, 100 Church Street, New York, New

17   York 10007, before Stacy Tepler and Anna Vortsman, Notaries

18   Public of the State of New York.

19

20

21

22

23

24

25

```
 1   A P P E A R A N C E S:

 2

 3   LAW OFFICE OF STEVEN MORELLI
             Attorneys for the Plaintiff
 4       MELISSA BASTIAN
             1461 Franklin Avenue
 5       Garden City, New York 11530
             BY:  JOSH BELDNER, ESQ.
 6

 7
     ZACHARY W. CARTER, ESQ
 8   CORPORATION COUNSEL
     NEW YORK CITY LAW DEPARTMENT
 9       Attorneys for the Defendant
             DEPARTMENT OF EDUCATION
10       100 Church Street
             New York, New York 10007
11       BY:  SEAN RENAGHAN, ESQ.
             File #:  2013041435
12

13
     ALSO PRESENT:
14       DONALD SULLIVAN, ESQ.
             SHAWN MATTHEW CLARK, ESQ
15

16
                     *           *           *
17

18

19

20

21

22

23

24

25
```

1    Q.   Have you ever pled guilty to a crime?

2    A.   Never.

3    Q.   Have you ever been arrested?

4    A.   No.

5    Q.   Have you ever at any time been accused of

6  discriminating against another person?

7    A.   No.

8    Q.   Have you ever been at any time accused of

9  retaliation?

10    A.   No.

11    Q.   Other than this lawsuit, have you ever accused

12  anyone of discriminating against you?

13    A.   No.

14    Q.   Other than this lawsuit, have you ever accused

15  anyone of retaliating against you?

16    A.   No.

17    Q.   What is the highest level of education that

18  you've achieved?

19    A.   I have a master's degree in school counseling,

20  and I have accumulated 12 credits beyond master's, still in

21  school counseling.

22    Q.   Let's start with the most recent.  The 12

23  credits, what institution, when, what time frame did you

24  take those?

25    A.   They're scattered.  I graduated in 2009, so I

M. BASTIAN

1  started taking a course here and there.  I don't really

2  remember the dates, but it's between 2009 and the last

3  course being of this year, 2014.  It was all taken at the

4  College of Saint Rose, it's like a pilot program that meets

5  on weekends.

6      Q.    The master's in school counseling, what

7  institution was that from?

8      A.    That is Alfred University, it's called the CITE

9  program, Center for Teachers Program -- its an acronym for

10  Center for Integrated Teacher Education.  They are

11  multi-sited, but university that I was affiliated with was

12  Alfred University.

13      Q.    Could you spell that?

14      A.    CITE is an acronym.  Center for Integrated

15  Teacher Education.  That is a large program, and they're

16  multi-sited.  They are affiliated with many universities,

17  Fordham, Saint Rose, but the university that I -- my

18  master's was under, was Alfred University.

19      Q.    When did you get your master's?

20      A.    2009, May 2009.

21      Q.    Then did you go to college before that?

22      A.    I did.

23      Q.    So do you have a college degree, what degree is

24  that?

25      A.    I have an associate's -- Hunter College, it's in

M. BASTIAN

1    A.    No, that was back in the '80s.

2    Q.    So when was the last time you were with them?

3    A.    The temp agencies?

4    Q.    Yes.

5    A.    In the '80s.

6    Q.    When did you start with the DOE?

7    A.    I started with the DOE 1980 -- I think it was

8    either '83 or '84, then I left, then I came back in 1995.

9    Q.    Where were you '83, '84, what was your position

10   with the DOE?

11   A.    I was school secretary.

12   Q.    Where were you a school secretary?

13   A.    At A. Philip Randolph.

14   Q.    When you came back what was your title?

15   A.    My title has always been school secretary.  I

16   left there, then I -- I went -- I left A. Philip Randolph,

17   I did the temp, then went to another school in 1986.  1986

18   I went to another school.

19   Q.    What was the name of that school?

20   A.    It was a multi-sited alternative school called

21   the Outreach Centers.

22   Q.    Where did you go after that?

23   A.    I stayed there until 1995.  1995 I left there

24   then I returned to A. Philip Randolph at 1995, and from

25   1995 until the present I've worked at A. Philip Randolph.

1    This is my second time there.

2        Q.    What are your current duties at A. Philip

3    Randolph?

4        A.    I am assigned to -- I am the pupil accountant

5    secretary/record secretary.

6        Q.    What are the duties of that position?

7        A.    Pupil accounting secretaries are responsible for

8    registration.  We are responsible for making sure that the

9    information, student profile is up to date.  If the child

10    is moved, changing that, changing guardianships.  We are

11    responsible for class changes, for scheduling of classes.

12    We are responsible for, in the event that there is a

13    distinctive situation within the family and there is some

14    kind of order of protection or restraining order, we are

15    responsible for putting that onto the screen so that if the

16    other parent who has been, I guess accused of doing

17    something to the child, tries to enter the school, they

18    will not be able to because it will go through the entire

19    school.  So people try to do different things with

20    different people, so it's a flag.  A warning flag.  What

21    else am I in charge of?  Pupil accounting, I do all the

22    flags, graduation updates, promotions, it's a lot.  I could

23    go on and on and on with this.  Functions of multitude.

24        Q.    Who is your supervisor?

25        A.    David Fanning.

1    Q.    You said that your title at A. Philip Randolph

2    has been school secretary the entire time.  Have your

3    duties changed while you were at A. Philip Randolph at all?

4    A.    Within recently?  Or what time frame?

5    Q.    The last ten years.

6    A.    It has.

7    Q.    Can you please tell me about that.

8    A.    Sure.  Under guidance, the guidance department

9    has many components.  Guidance is attendance.  It is

10   college, college preparation, it is scheduling, it is

11   programming, of course it's guidance, it's records.

12   Anything that would affect the child outside of the

13   classroom, that is not instructional would fall under

14   guidance.  I have been the secretary to college office.

15   Q.    What was the time period for that?

16   A.    I can't say with accuracy, I really --

17        MR. BELDNER:  Don't guess.

18   A.    I need to look at my résumé.  I can't remember.

19   Q.    Where did you go from guidance?

20   A.    That is one of the positions, guidance, that was

21   actually in the guidance department.  Is it confusing?  The

22   guidance department has many units.  Attendance,

23   programming, scheduling, college, records, people

24   accounting, all of that falls under guidance, and under

25   that, I've done everything outside the attendance pace --

1  the attendance monitor.  I've been in almost every

2  department in guidance.

3      Q.    Do you remember roughly chronologically, how you

4  moved about within those roles?

5      A.    Chronologically, when I entered A. Philip

6  Randolph in 1995, I was in guidance, I was assigned to the

7  guidance department.  From the guidance department, I was

8  assigned to records.  From records, I was assigned -- take

9  records out.  I was assigned to the college office.  I am

10  trying to keep it in order.  From the college office -- but

11  while I was in the college office, I was also doing other

12  responsibilities.  But that was the gist of it.  That was

13  the main responsibility I had.  From the college office, I

14  went to records and pupil accounting.  I am still there.

15      Q.    You are still there?

16      A.    I am still there.

17      Q.    So you moved from college to records to pupil

18  accounting?

19      A.    Correct, with other responsibilities too, but

20  that is what happened in guidance.

21      Q.    Just back up a little bit, is Outreach a DOE

22  facility?

23      A.    Yes.

24      Q.    That is still part of DOE while you were there?

25      A.    Outreach centers are multi-sited.  There is a

1  site in each borough.  They specialize in servicing young

2  people who -- they are nontraditional --  young people who

3  have left school and who are kind of overage, but under

4  credited, and know that there is no way in this world they

5  will be able to get a high school diploma by the time they

6  reached the age before, you know, having to leave high

7  school.  So these programs combine academic curriculum so

8  that the student would be able to get what he or she needs

9  and graduate from high school.  It's Department of

10  Education.

11      Q.    So you've been continuously at the Department of

12  education since about 1983-1984; is that correct?

13      A.    Not continuously, remember I left.

14      Q.    I thought you said you left to go to Outreach?

15      A.    No, when I left in 1984, I left the school, then

16  that is the temp jobs, that is when the temp jobs kicked

17  in.  Then I returned in '86, that is when I went to the

18  Outreach program.  The Outreach program, I stayed there

19  until 1995.  Then when I left the Outreach program, I

20  returned to A. Philip Randolph High School.

21      Q.    Why did you come back to the DOE?

22      A.    I needed a job.

23      Q.    Did you request to go specifically to A. Philip

24  Randolph?

25      A.    I did, I -- the hiring situation at the

1    Department Education, because it's a long time ago, was way

2    different than now.  So you would contact the hiring hall

3    at 65 Court Street, and whatever was available in your

4    field, the hiring hall would send you out on interviews.

5    And I did that.  I contacted them, but then I found out

6    there was a position at A. Philip Randolph.  So I said wow,

7    I will go back.  That is how it happened.

8        Q.    Why did you leave the DOE to take the temp jobs,

9    why did you choose -- or did you choose?

10       A.    Yeah, I did.  I chose, because Ms. Tailor didn't

11   want me to leave.  She is the founder of that school, by

12   the way.  I was like 22, 23, so I wanted to branch out.  I

13   had just graduated high school -- I just graduated college,

14   I was like 23 years old.  I wanted to see different things

15   and move around.  That is when I went into temp.  When I

16   found out I didn't really want to be in temp any more, I

17   came back to the Department of Education, I like my summers

18   off.

19       Q.    I want to get into your allegations here.  You

20   are alleging in this lawsuit that the DOE and its employees

21   took employment actions against you that were

22   discriminatory; is that correct?

23       A.    That is correct.

24       Q.    You are also claiming that DOE and its employees

25   took actions or made statements that created a hostile work

1  environment; is that correct?

2  A.  That is correct.

3  Q.  Are both of these claims based on race?

4  A.  Yes.

5  Q.  Is there any other discriminatory basis that you

6  are claiming that these actions were based upon, other than

7  race?

8  A.  Other than race?  I do believe it has something

9  to do with age as well.

10  Q.  Any others, any other basis?

11  A.  No.

12  Q.  Is that for both the allegations of employment

13  discrimination and for the allegation of creating a hostile

14  work environment, just those two?

15  A.  Yes, employment more so for both, and the hostile

16  was for race.

17  Q.  So hostility just for race?

18  A.  Yes.

19  Q.  But race and age for the employment actions?

20  A.  Correct.

21  Q.  Who were the persons that you are claiming

22  discriminated against you?

23  A.  Henry Rubio.

24  Q.  Anyone else?

25  A.  Gilberto Garcia.

1    Q.    Anyone else?

2    A.    Gerasimos Menegatos.

3    Q.    We have given a list of names to the reporter.

4    A.    Okay.

5    Q.    Is there anyone else that you are claiming

6    discriminated against you?

7    A.    No.

8    Q.    For Mr. Rubio, for Henry Rubio, what is his race?

9    A.    Dominican descent.

10   Q.    What is his name?

11   A.    At the time he was principal at A. Philip

12   Randolph.

13   Q.    Was he responsible for supervising you?

14   A.    No.

15   Q.    Did you report to him in any capacity, Mr. Rubio?

16   A.    I would report to him if he assigned something to

17   me.

18   Q.    What was Mr. Garcia's race?

19   A.    Dominican descent.

20   Q.    What was Mr. Garcia's title?

21   A.    Assistant principal of security.  There were a

22   number of departments that he was in charge of, world

23   languages and something else, I don't remember.

24   Q.    Was Mr. Garcia responsible for supervising you?

25   A.    No.

1    Q.    Did you report to Mr. Garcia in any capacity?

2    A.    I was assigned to work with him, along with other

3    supervisors, at one point.  So when I needed to work, when

4    I was assigned to work with him, yes, I would report to him

5    for that particular situation.

6    Q.    Other than when you were assigned to work for

7    him, did you report to him in any capacity, either directly

8    or indirectly?

9    A.    No, just in that capacity.  My direct supervisor

10    was Gerasimos Menegatos.

11    Q.    Just going back to Mr. Rubio.  Were you ever

12    assigned to work for him directly?

13    A.    Mr. Rubio?

14    Q.    Yes.

15    A.    No.

16    Q.    Did you report to him either directly or

17    indirectly in any capacity at any time?

18    A.    I did report to him directly if he assigned

19    something to me, then I would report to him directly.  Most

20    of the times when he would assign, if there was a subpoena

21    that came from the legal department, Department of

22    Education, he would give it to me directly because part of

23    my capacity was to prepare the student documents and answer

24    the subpoena or make sure that it was prepared in an

25    appropriate amount of time and respond to all the parties

1    that needed to respond to.  So I would definitely report

2    directly to him regarding those cases.

3        Q.    But other than that?

4        A.    Other than that, no.

5        Q.    Mr. Menegatos, what was his race?

6        A.    Greek heritage.

7        Q.    What was Mr. Menegatos's title?

8        A.    He was the assistant principal of organization.

9        Q.    Did you report Mr. Menegatos?

10       A.    Yes.

11       Q.    In what capacity?

12       A.    Assignments, questions, concerns, ordering

13    supplies, he would set my assignments.  He was in charge of

14    me, in charge of everything.

15       Q.    For what time period?

16       A.    I can't really remember the years, I would say

17    maybe three, four years.  He left in 2000 -- he left in --

18    I can't remember the exact years.

19       Q.    Do you remember most recently when you reported

20    to him.  What was the most recent time period?

21       A.    2011, right before he left.

22       Q.    So he left A. Philip Randolph; is that correct?

23       A.    Yeah, yes.

24       Q.    That was in 2011?

25       A.    Yes.

M. BASTIAN

1     Q.     Do you remember the month?

2     A.     Say 2012, January, was early January.

3     Q.     Have you had any interaction with him since then?

4     A.     Oh no.

5     Q.     Mr. Garcia, when was the last time that you

6 interacted with him?

7     A.     2014, January, 2014.

8     Q.     Was he still working at A. Philip Randolph at

9 that time?

10     A.     He was there, he left in January 2014 when I got

11 back from jury duty.

12     Q.     So since he left in January 2014, have you

13 interacted with him in any way?

14     A.     No.

15     Q.     Mr. Rubio, is he still with A. Philip Randolph?

16     A.     No.

17     Q.     When did he leave?

18     A.     He left in 2011.

19     Q.     Do you remember the month?

20     A.     December 2.

21     Q.     Have you interacted with him at all since

22 December 2011?

23     A.     No.

24     Q.     I would like you to go through, chronologically,

25 the allegation of employment discrimination, so we will go

1    to the hostile work environment allegations later.  After

2    we go through them chronologically, we can go through them

3    in a little more detail.

4         Going chronologically, what are the employment

5    actions that you are claiming that were taken against you

6    based on race?

7    A.    So in 2007 I commenced my program in school

8    counseling.  Mr. Rubio and Mr. Menegatos were very much

9    aware of it because part of my internship was at A. Philip

10   Randolph, which they both approved, so that I would be able

11   to do field work there.  In 2009 I met Mr. Rubio in his

12   office and I handed him a cover letter résumé, and I showed

13   him a copy of my degree that I had finished school.  And I

14   handed it to him and said in the event something happens, I

15   would like to be considered.  He accepted it and said okay,

16   I will hold it and I will consider you.  That is in 2009.

17   From 2010 on, I began to see counselors hired, I did not

18   see any posting that the DOE says must be posted.  I didn't

19   see anything on the computer.  I didn't see anything

20   properly posted in the main office.  So I was like kind of

21   not understanding what was going on.  So then I had gone to

22   Mr. Rubio and I asked him.  I said I see that you are

23   hiring counselors, he said there is a freeze going on.

24   This was in 2009.  A hiring freeze, and a hiring freeze

25   meant you could only hire people who were holding on to the

M. BASTIAN

1    -- part of the license had, what is considered a bilingual

2    extension.  It means that there were courses taken and a

3    test passed, in order to qualify you for that extension to

4    your license.  So I was believing Mr. Rubio that this was

5    actually the case, but then I come to find out through my

6    union representation at a union meeting at my school that

7    the individuals that he had hired were not under the

8    bilingual license.  That they were actually under the

9    monolingual license, the same license that I hold.  So it

10   really became strange to me that if that was a fact that he

11   was able to hire monolingual people, then why was I not

12   considered.  So I am truly believing him that I am going

13   with him with the freeze, but when I came to find that out,

14   I realized I was being discriminated against.

15        Q.    So you believe that the hiring of the guidance

16   counselors was discriminatory against you?

17        A.    Yes.

18        Q.    Is that based on race?

19        A.    That is based on race because he hired three

20   Hispanics and one Caucasian woman.

21        Q.    Is that also based on age as well, you mentioned

22   age earlier, or is that only race?

23        A.    I believe that is based on age as well, because I

24   just believe that, yes.

25        Q.    Beyond the hiring of these guidance counselors,

1    do you know, are there any other employment actions that

2    you are claiming are discriminatory against you?

3        A.    Give me an example.

4        Q.    So you are claiming there are a number of, or I

5    am not certain, I am trying to ascertain what the

6    employment actions that you are claiming were

7    discriminatory against you.  So it's my understanding based

8    on what you just told me, you are claiming that the hiring

9    of these guidance employees, you believe was

10   discriminatory.  Are there any other employment actions

11   taken by DOE employees that you also feel were

12   discriminatory?

13       A.    I'm not sure if I understand.

14       Q.    Were there any changes in your employment, any

15   changes in conditions, or any positions that you felt you

16   should have gotten that you also feel were discriminatory?

17       A.    No.

18       Q.    So beyond just the hiring of these guidance

19   counselors, these are the only employment actions that you

20   feel were discriminatory against you?

21       A.    Well, outside of the animosity and the hostility,

22   if that is what you mean.

23       Q.    We will get into that.  I want to go into a

24   little detail to those guidance counselor positions.  You

25   mentioned not being given a guidance counselor position,

1   and you mentioned talking to Mr. Rubio about your interest

2   in that.  When was that, that you first spoke to him?

3       A.      I spoke to him in the summer, it was July 2009.

4   I graduated in May 2009 and I had received my license.  I

5   had taken in my degree to show him.  So he had known I was

6   graduated, and he, I was waiting for the license to come in

7   as soon as I received it.  I took it in and I showed it

8   both to him and Mr. Menegatos, and they both knew I was

9   actively seeking out a position.

10      Q.      So what did that conversation go like, what was

11  said, what was suggested?

12      A.      I went into his office, it was summer, it's kind

13  of lax during the summer.  He was sitting down, I said I

14  have something to show you.  What he said what is it?  He

15  started looking at it, he said wow.  And I said please hold

16  on to this, and he said that he would, and if anything

17  opens up he said he will definitely let me know.

18      Q.      This is Mr. Rubio?

19      A.      Yes.

20      Q.      Was anybody else present?

21      A.      No.

22      Q.      So it was just you and Mr. Rubio at that time?

23      A.      Yes.

24      Q.      What documents did you give?

25      A.      A cover letter, my résumé.

M. BASTIAN

1    Q.    Anything else?

2    A.    A copy of the license.

3    Q.    What if anything did Mr. Rubio say he would do?

4    A.    He would hold on to it.  In the event something

5    opens up, he will definitely let me know.

6    Q.    Did he say anything else?

7    A.    No.  I didn't give Mr. Menegatos the paperwork,

8    but I told him about it.  So he was much aware about it.

9    As a matter of fact, he is the one who said -- when I went

10   to him first, I said give everything to Rubio, let him hold

11   on to it and yeah, that is how it went.

12   Q.    That was also in July 2009?

13   A.    Yeah, it was in the summer.

14   Q.    Was there any discussion at that time about what

15   positions he was able to hire for?

16   A.    We had no discussion, he just said he would hold

17   onto the paperwork.

18   Q.    Did he say anything to you about being able to

19   hire bilingual or monolinguals at that time?

20   A.    There was no conversation.  He just accepted the

21   paperwork and we talked for like a minute or so, and I

22   left.

23   Q.    So there was no discussion beyond that, at that

24   time?

25   A.    No.

1     Q.    What was your understanding at the end of the

2   discussion, what was the understanding of what the next

3   step would be?

4     A.    My understanding was yes, he would hold on to the

5   paperwork, and if something happens, you know, if he was

6   considering opening up that position, he would let me know.

7     Q.    Are you bilingual?

8     A.    Meaning?

9     Q.    Can you fluently speak more than one language?

10    A.    I can understand Spanish.

11    Q.    Can you speak Spanish fluently?

12    A.    In conversation I will be able to.

13    Q.    Fluently?

14    A.    Maybe not fluently, but the gist of the

15  conversation I may be able to understand.  I know many

16  Hispanic people, and I don't know if I should repeat it,

17  but my family is from Saint Thomas.  We are really next to

18  Puerto Rico, so there are many Spanish speakers in my

19  family.

20    Q.    Do you have any licenses, any bilingual licenses

21  or certifications?

22    A.    I do not.

23    Q.    Did you ever try to get any bilingual licenses or

24  certifications based on your understanding?

25    A.    No.

1    Q.    Why not?

2    A.    I didn't think that I needed to get a bilingual

3    license -- not license, it's an extension.  It comes with

4    the license.  Not all principals ask for bilingual, unless

5    there is a real need for it.  So I didn't see the need to

6    pursue that.  Some districts are overwhelming, depending on

7    the population of children.  It could be not even Spanish,

8    it could be anything, Mandarin or any other language, and

9    it's definitely a need to have a person who is able to

10   communicate with the children, then with the parents, but

11   more so with the children, because they are there with the

12   children every day.

13   Q.    So you mentioned guidance counselors subsequent

14   to this July 2009 conversation being hired at A. Philip

15   Randolph, correct?

16   A.    Sorry, what?

17   Q.    I believe you mentioned before there was some

18   guidance counselors that were brought on at A. Philip

19   Randolph after you had had this conversation with Mr. Rubio

20   in July; is that correct?

21   A.    Starting in 2010.

22   Q.    Do you remember who those guidance counselors

23   were?

24   A.    Yes.

25   Q.    What were the names?

1      A.      Altagracia Ramirez.

2      Q.      Anyone else?

3      A.      Yes, Altagracia Ramirez came first, then Lauren

4   Porzelt.  She does not hold a bilingual license, I also

5   found that out.  She does not hold a bilingual license, she

6   did not hold one when she was hired, and I understand she

7   does not held one now.  There is a test that you have to

8   pass, and she did not pass that test.

9      Q.      Anyone else?

10     A.      Yes, Ezequiel Perez.

11     Q.      Anyone else?

12     A.      Ingrid Paulino.

13             MR. BELDNER:  Do you mind if we take three

14             minutes.

15             (Whereupon, an off-the-record discussion was

16             held.)

17     Q.      We are back on the record.  I will go through

18   each of the individuals that you just mentioned, each of

19   their hirings, but first off, I want to backtrack.

20             You mentioned an internship at A. Philip

21   Randolph, could you please explain what that is?

22     A.      Right, as part of being any position -- sorry,

23   any degree in counseling requires an internship in field

24   work, and you would need to like do a hands-on with the

25   kids.  Like sort of like when doctors do residency.  So I

1    did my internship, well, one of them there, at A. Philip

2    Randolph High School.

3        Q.    Did you work with anyone specifically, did you

4    have a sponsor, anything like that?

5        A.    Yes, I did.  Mr. Menegatos was my supervisor, in

6    addition to Mr. Brennan, because I needed to have a person

7    on site who was a licensed counselor, so it was Dennis

8    Brennan, who is now retired.

9        Q.    So they helped you get this?

10       A.    They were my supervisors on site.  I would meet

11   with both of them.  Let them know what I am doing and

12   sporadically showed them my log of services and activities,

13   because they were my signers.

14       Q.    What does that mean?

15       A.    My supervisors, when I return my paperwork back

16   to the program, I needed someone to be my supervisor.

17       Q.    Did you find them supportive?

18       A.    Mr. Brennan, yes.  I dealt with him mostly.

19       Q.    What about Mr. Menegatos, did you deal with him

20   at all in your internship?

21       A.    He needed to approve it, for the fact that I was

22   working with the students at the school, so I hardly ever

23   met with Mr. Menegatos.

24       Q.    Did you ever meet with him at all in order to get

25   his approval?

1    A.    I did, at the beginning I met with him and he

2  approved it, from there I was meeting with Mr. Brennan.

3    Q.    Both of them signed off on your paperwork?

4    A.    Yes, both.

5    Q.    Did Mr. Brennan report to Mr. Menegatos?

6    A.    He, yes.

7    Q.    What was Mr. Brennan's title?

8    A.    He was a counselor, college advisor, I worked

9  with him.

10    Q.    We will go back to the individual hires of

11  guidance counselors after 2009.  Going chronologically, I

12  will start with Altagracia Ramirez; is that correct?

13    A.    Yes.

14    Q.    When was Ms. Ramirez hired?

15    A.    2010.

16    Q.    Do you remember the month?

17    A.    September.

18    Q.    Do you know what position she was hired for, her

19  title?

20    A.    Guidance counsellor.

21    Q.    Do you know what her qualifications were?

22    A.    She mentioned to me she had come from work at

23  CUNY admissions center.  It's a non-DOE employer.

24    Q.    Do you know anything else about her

25  qualifications?

1     A.     She mentioned she didn't work for the Department

2    of Education and this was her first job there.

3     Q.     Anything else?

4     A.     She had just graduated from an under-counseling

5    program.

6     Q.     Do you know what program that was?

7     A.     Sorry?

8     Q.     Do you know what program that was?

9     A.     The name of her school, no.

10    Q.     Do you know anything else about her

11   qualifications?

12    A.     That is it.

13    Q.     All of this information, this is from

14   conversations that you had with Altagracia Ramirez?

15    A.     Yes, conversations with her.

16    Q.     Do you know if Ms. Ramirez is bilingual?

17    A.     Yes.

18    Q.     Yes, she is bilingual?

19    A.     Yes, she is bilingual.  Is she a Spanish speaker,

20   is that what you mean?

21    Q.     Is she a Spanish speaker?

22    A.     Yes, she is.

23    Q.     What is Ms. Ramirez' race?

24    A.     Hispanic.

25    Q.     How do you know what her race is?

1    A.    Speaking with her -- how do I know?  She has

2  identified herself as being Hispanic at times.

3    Q.    When did she identify herself as being --

4    A.    Different conversations.

5    Q.    Do you remember ballpark time frame?

6    A.    I remember her speaking with a parent one time

7  and she identifying herself as being Hispanic.  Standing

8  there.

9    Q.    Any other times?

10   A.    I hear her speaking Spanish all the time.  She

11  has mentioned to me that she has traveled to Puerto Rico to

12  see her family.

13   Q.    How did Ms. Ramirez apply for that position?

14   A.    I don't know.

15   Q.    Do you know how she came to be hired?

16   A.    I don't know with what capacity.  Do you mean a

17  posting, advertisement?

18   Q.    Yes.

19   A.    I don't know, I don't know.

20   Q.    Between when you spoke to Principal Rubio in 2009

21  and the hiring of Ms. Ramirez, what did you do in relation

22  to seeking a guidance counselor position at A. Philip

23  Randolph?

24   A.    Sorry, repeat that.

25   Q.    Between July 2009, which I believe you said you

1    had the conversation with Mr. Rubio; is that correct?

2         A.    Yes.

3         Q.    Between then and when Ms. Ramirez was hired, when

4    she came to be a guidance counselor at A. Philip Randolph,

5    did you take any action in regard to seeking a guidance

6    counselor position at A. Philip Randolph?

7         A.    I did nothing, because at the time I was under

8    the assumption there was a freeze only for bilingual hires.

9         Q.    There was a freeze, sorry, why did you have that

10   impression?

11        A.    Mr. Rubio had told that to me.

12        Q.    When did he say that?

13        A.    In 2009, in September, when I had -- sorry, 2010,

14   when she was hired I had then went back to him and asked

15   him what is going on.  I thought you said you weren't

16   hiring anybody.  That is when he said there was a freeze

17   coming on, and he could only hire bilingual.

18        Q.    So I am clear, the freeze was on monolingual, not

19   bilingual positions, is that what you are saying?

20        A.    Yes.

21        Q.    You didn't have this conversation with Mr. Rubio

22   until after Ms. Ramirez was hired?

23        A.    That is correct.

24        Q.    But before Ms. Ramirez was hired, I believe you

25   had testified before that the reason that you didn't do

1   anything is because you thought there was a freeze; is that

2   correct, or is it that inaccurate?

3       A.      That is correct, in 2009.

4       Q.      So please, excuse me, I am trying to get the

5   timeline then.  If you are saying you had this conversation

6   after Ms. Ramirez was hired, and you found out there was a

7   freeze, how could you be under the impression beforehand?

8       A.      In 2009 when I handed him the papers, in 2010 he

9   hired her.  Okay, he started hiring, I am still now going

10  with Mr. Rubio that there is a freeze going on, but in 2010

11  when she is hired, I don't know -- I am asking him what is

12  going on, are you hiring people, and he said no, there is a

13  freeze, she has a bilingual license.

14      Q.      Since 2009 until she came on, you hadn't taken

15  any action at A. Philip Randolph to seek a position?

16      A.      I did not, because I was waiting for him to say

17  something to me, and nothing was being advertised.

18      Q.      Had you sought a position anywhere else during

19  that time period, anywhere else either within the DOE or

20  outside of the DOE?

21      A.      I was making feelers and making different calls

22  and putting my name out there just in case something else

23  opened up.

24      Q.      Do you remember to where?

25      A.      There were so many schools.

M. BASTIAN

1    Q.    Anything else said during that conversation?

2    A.    No.

3    Q.    Was anybody else there for that conversation?

4    A.    No.

5    Q.    Did you do anything else after that?

6    A.    In terms of what?

7    Q.    Did you go speak to anybody else, did you go --

8    A.    No, because there is really nobody else to speak

9    to outside of the principal.

10   Q.    Did you file a complaint of any kind at that

11   time?

12   A.    No, not in 2009 -- sorry, not in 2010.

13   Q.    Moving on to Ms. Porzelt, when was she hired?

14   A.    I think it was April -- I believe it was April of

15   2011.

16   Q.    What position was she hired for?

17   A.    Counselor.

18   Q.    What are Ms. Porzelt's qualifications?

19   A.    What I know is she had come from Rice High

20   School, she said she was a counselor there, that is all.

21   Q.    Do you know anything else about her

22   qualifications?

23   A.    I don't.

24   Q.    Rice High School, you know that because she told

25   that to you; is that correct?

1  A.  She did mention it to me.  She also mentioned to

2  me she was in the process of still trying to get

3  credentialed for the bilingual extension.  She had not

4  gotten it.  She did mention she knew she would not be able

5  to pass the test because she is not a Spanish speaker, and

6  she knew she would not be able to pass the test to get that

7  extension.

8  Q.  When was that conversation?

9  A.  Probably like when she first started, I guess

10  around April-ish, May-ish.

11  Q.  Of 2011?

12  A.  Yes.

13  Q.  Was anybody else there for that conversation?

14  A.  No.

15  Q.  What specifically did she say?

16  A.  That she was in school.  Actually there was a

17  person there, there was another employee there.

18  Q.  What is that employee's name?

19  A.  Sonia Burke, but she was asking for assistance.

20  She is a bilingual counselor.  She was asking her for

21  assistance on how to take that -- how to pass the test.  So

22  we were together.

23  Q.  Ms. Porzelt was asking for assistance, is that --

24  A.  Yes.

25  Q.  From Ms. Burke?

1      A.     Yes.

2      Q.     Do you remember specifically what she was asking

3 for assistance with?

4      A.     She was asking for pointers on how to pass the

5 test, what does the test require, how to -- just general

6 pointers.

7      Q.     Have you heard Ms. Porzelt speak Spanish at all?

8      A.     Oh, never.

9      Q.     Other than this conversation, was there any other

10 reason why you believe she is not bilingual?

11      A.     Why she --

12      Q.     Ms. Porzelt, other than this conversation you had

13 with her in April 2011?

14      A.     Is there a reason she is not bilingual?

15      Q.     I believe you said that she is not bilingual; is

16 that correct?

17      A.     She is not bilingual.  She said she is not

18 bilingual.

19      Q.     During that conversation?

20      A.     Not during that conversation, but in

21 conversation.

22      Q.     When was that?

23      A.     I don't know.

24      Q.     Ballpark, if you remember?

25      A.     I mean different times, we would meet up, we

1    complaint was?

2       A.    Mr. Self's claim was discrimination.  I know he

3    retired in the middle of the week just like that.  Just up

4    and left.

5       Q.    Do you know what the result of his complaints

6    were?

7       A.    I don't.

8       Q.    When did you first conclude that Mr. Rubio was a

9    discriminator?

10      A.    When I started hearing of the complaints from

11   other people in the building.  And it seems like everything

12   in the building that was really, who had any grievance, a

13   complaint, was always African American.  And I really

14   couldn't understand why because our school is very diverse,

15   but everyone in the building that was always complaining,

16   it was always a person who was African American.

17      Q.    Do you remember when that was, about what time

18   period?

19      A.    He started in 2007.  I would probably say like

20   soon after.

21      Q.    Did you feel that way before Mr. Rubio started?

22      A.    No, I love A. Philip Randolph, that is why I

23   returned.  I stayed there so long. I want to now -- well,

24   in June we had five retirees, so I am now probably one of

25   the leftovers at A. Philip Randolph who have a 20 year

M. BASTIAN

1    stay.  I love it.  I love the school.

2        Q.    Do you still love it now?

3        A.    Not the way I loved it prior to everything

4    happening.

5        Q.    Do you -- I don't believe you mentioned

6    Mr. Fanning's name before when you were giving a list of

7    who you felt had discriminated against you.  Did you feel

8    Mr. Fanning had discriminated against you?

9        A.    Rephrase that?

10       Q.    I don't believe before, when you went through a

11   list of people that had discriminated against you that you

12   had mentioned Mr. Fanning's name.  He is the current

13   principal?

14       A.    Yes, he is.

15       Q.    Do you feel that Mr. Fanning had discriminated

16   against you?

17       A.    I don't think Mr. Fanning discriminated against

18   me the way that Mr. Rubio has.

19       Q.    Do you feel that he has at all?

20       A.    I'm not sure if I understand the question.

21       Q.    Do you feel that --

22       A.    Has he done anything?

23       Q.    Yes.

24       A.    I would say no.

25       Q.    Has he said anything that you feel was

1   discriminatory towards you?

2       A.    He has not.  However you know, he was -- no, I

3   would say no.

4       Q.    If you don't mind, I will back up and backtrack

5   to Ms. Porzelt.  After Ms. Porzelt was hired, did you do

6   anything next, did you go attempt to speak to Mr. Rubio or

7   anybody else?

8       A.    No.

9       Q.    Did you file a complaint?

10      A.    No, my complaint came after Mr. Perez -- I am not

11  sure if Paulino was there yet, it came after Mr. Perez, I

12  went to OEO.

13      Q.    Between when Mr. Ramirez came on, and Ms. Porzelt

14  came on, did you do anything specifically in regard to

15  getting a guidance position at A. Philip Randolph?

16      A.    No.

17      Q.    Did you attempt to speak to Mr. Rubio again about

18  getting a position?

19      A.    Between Ms. Ramirez and --

20      Q.    Ms. Porzelt.  I believe you said Ms. Ramirez was

21  the first one to come on and Ms. Porzelt was the next one

22  to come on after Ms. Ramirez; is that correct?

23      A.    Yes.

24      Q.    After I guess after Ms. Ramirez came on and

25  before Ms. Porzelt came on, did you attempt getting a

1    guidance counselor position again with Mr. Rubio?

2        A.    I had not.

3        Q.    The next person to come on was Ezequiel Perez; is

4    that correct?

5        A.    Yes.

6        Q.    When was he hired?

7        A.    He was hired, I think it was in the spring.  I

8    remember spring.

9        Q.    Do you know a ballpark school year?

10       A.    I don't.  I think I am confusing two dates -- I

11   am confusing their dates, I am not sure.

12       Q.    If Ms. Porzelt came on in April 2011, it would

13   have been after that?

14       A.    Right, it would have been after that.  That is

15   why I know there is a discrepancy with the dates.  First it

16   was Altagracia Ramirez then it was Lauren Porzelt, then it

17   was Ezequiel, I am not sure the dates.

18       Q.    But it was after Ms. Porzelt and it was -- was it

19   before Ms. Paulino?

20       A.    It was before Ms. Paulino, yes, she was the last

21   one hired.

22       Q.    So it was between the two of them?

23       A.    Yes.

24       Q.    Do you know what position Mr. Perez was hired

25   for?

1  A.  Counselor.

2  Q.  Do you know what Mr. Perez's qualifications were?

3  A.  Qualifications?

4  Q.  His experience, training.

5  A.  What Mr. Perez said to me in conversation, was

6  that he was a parent coordinator coming from, I think it

7  was Satellite Academy, and that was it.  He had come from

8  being dean of parent coordinating.

9  Q.  Do you know anything else about his

10  qualifications?

11  A.  No.

12  Q.  Do you know if Mr. Perez is bilingual?

13  A.  He is a Spanish speaker.

14  Q.  Do you know if he is fluent?

15  A.  I would say -- I would, I probably would say he

16  is fluent.  You mean the level he speaks, or the speed he

17  speaks?

18  Q.  Yes, I guess the level in which he speaks,

19  understands.

20  A.  I don't know the level he understands, I heard

21  him speak Spanish before.

22  Q.  What is Mr. Perez's race?

23  A.  Dominican, he identifies himself as Dominican

24  heritage.

25  Q.  Has he identified himself as Dominican to you?

1    A.    He has.

2    Q.    Do you remember when?

3    A.    What date?

4    Q.    Ballpark time frame.

5    A.    Shortly after he arrived, talking, I heard him

6    speaking in conversations with the assistant principal, Mr.

7    Calcano, and it was often Mr. Calcano and Mr. Perez and you

8    know, other people from other departments, but they were

9    always being Dominican and congregating in his office all

10   the time.  So it was like really obviously, you know, it

11   was really not hard to figure out.

12   Q.    Does that mean they were speaking in Spanish?

13   A.    Yes.

14   Q.    So they would speak Spanish together?

15   A.    Yeah, they would congregate, and when Ms. Paulino

16   came, she joined in, it was always like a group session of

17   Dominican people.

18   Q.    Who were these other individuals that you just

19   mentioned?

20   A.    It could be people from other departments.

21   School aides, just people in school, different --

22   Q.    Do you remember some of their names?

23   A.    Yeah, Podomo, Amin.

24   Q.    Spell that?

25   A.    A-M-I-N, Podomo.  His first name is Oscar and his

1    last name is spelled G-A-R-U-L-L-O-N.  These were the

2    assistants that came along with Mr. Rubio, so they would

3    always be in Mr. Calcano's office, always groups at a time.

4    Either engaging in lunch or just general conversation, in

5    very clique kind of formation.

6         Q.    Do you know how Mr. Perez came to apply for the

7    counsellor position?

8         A.    I do not.

9         Q.    Do you have any idea how he came to be hired?

10        A.    How he learned of the position?

11        Q.    And how he ended up getting employed at the

12   school?

13        A.    I do not.

14        Q.    Going back to the conversations, where you said

15   Dominican members of the staff would congregate together,

16   do you know if there were any non-Dominican members of the

17   staff that were part of the conversation?

18        A.    No, it was always Spanish, it was never anybody

19   else other than Dominican.

20        Q.    Would the other members of the staff branch out

21   and speak to you and other non-Dominican members of the

22   staff?

23        A.    Say again.

24        Q.    Would Mr. Perez speak to yourself and other

25   non-Dominican members of the staff?

M. BASTIAN

1    A.    Yes, he would.

2    Q.    And Mr. Calcano?

3    A.    Yeah, they have to.  I am talking about when they

4    all got together.

5    Q.    But they didn't just stick to themselves the

6    entire time?

7    A.    Most of the time, yes.

8    Q.    But not all the time?

9    A.    Not all the time.  They had to come out of the

10   office at some point to do some work.  Most of time you

11   always see them congregating, always eating lunch together

12   and no one else would be invited.  But that group -- yeah.

13   Q.    Did you ever ask to join them for lunch?

14   A.    No.

15   Q.    Do you know if anybody ever got turned down when

16   they asked to join them?

17   A.    I don't know if anybody ever asked, no.

18   Q.    Between the hiring of Ms. Porzelt and the hiring

19   of Mr. Perez, did you approach Mr. Rubio about guidance

20   position?

21   A.    I didn't approach him.  I asked Mr. Menegatos

22   what was happening.  And he would just get rid of me real

23   quickly like "go ask Rubio, go ask Rubio."  That was

24   usually his response.

25   Q.    That was on more than one occasion?

1    A.    Yeah.

2    Q.    Do you remember what you said to him,

3    specifically?

4    A.    I asked him is the hiring freeze lifted, I asked

5    why is there no posting of any position, and he would never

6    have a real answer for me.

7    Q.    What would he say?

8    A.    "Go ask Rubio."

9    Q.    Anything else?

10   A.    No, "go ask Rubio, go ask Rubio."

11   Q.    Do you know about when these conversations took

12   place?

13   A.    They were just throughout, I don't have a

14   specific date and time.  I do remember one time Mr.

15   Menegatos did call me into his office, and I didn't know

16   why, there was a summons there, so I went.  And he asked

17   for my Social Security number.  And I gave it to him.  I

18   didn't know what was really going on.  Then he said, "I am

19   trying to hire you."  I said hire me?  Did something

20   happen?  I am happy, you know, and he said, "I am trying to

21   hire you, but it won't go through."

22   Q.    So he couldn't get it in the computer, or --

23   A.    He said it won't go through.  He asked for my

24   Social Security.  How you hire is from your Social

25   Security.  DOE has something called Galaxy.  You put the

1     individual's Social Security number, and he said it won't

2     go through, and I said why wouldn't it go through, but

3     later found that he was not doing that, he was fooling me.

4     Q.     How do you know that?

5     A.     That he was fooling me?

6     Q.     Yes.

7     A.     That is not how you do it.  There is no such

8     thing as trying to put in a Social Security number and say

9     it won't go through.  If you put a Social Security number,

10     it will go through.

11     Q.     What is this in regard to?  Could you explain the

12     process to me, I am not certain I understand.

13     A.     There is certain information you need in hiring

14     someone.  He arbitrarily called me into his office and said

15     give me your Social Security number.  I didn't know why he

16     wanted that because he already had it.  Once you pull a

17     person up, their whole profile would come up.  Then he said

18     he was trying to hire me.  I believed it until I found out

19     that was not true.  He was fooling me, I don't, I don't

20     know why.

21     Q.     You were the one that found out that he was

22     fooling you?

23     A.     Yes.  I found out that is not true.  Once your

24     Social Security number is entered, if you are going to be

25     hired, you are hired, there is no such thing as it cannot

1  go through, as if there is some kind of malfunction with

2  the computer.

3    Q.    When he told you that it wouldn't go through, did

4  you think right there that he was lying, was it later you

5  came to the conclusion that --

6    A.    It was later.  At the beginning I believe him,

7  but it was later that I realized he was not telling me the

8  truth.

9    Q.    What happened later that made you realize that?

10   A.    I asked around and I called downtown, I called

11  HR.

12   Q.    When was that?

13   A.    Probably a month later, afterwards.

14   Q.    Sorry, backing up, I don't know if we established

15  when this event with Mr. Menegatos happened.  When did you

16  speak with Mr. Menegatos, when did he attempt to put in the

17  Social Security number?

18   A.    When?

19   Q.    Month, year?

20   A.    I don't remember, sometime in 2011.

21   Q.    You called HR about a month later, is that right?

22   A.    I did call.

23   Q.    What did they say to you?

24   A.    "It's not how that's done."

25   Q.    Did you talk to Mr. Menegatos about that after

1    you had your conversation --

2         A.    No, I didn't say anything to him.

3         Q.    What about between when he attempted to put it in

4    and when you called HR, did you have any more discussions

5    with Mr. Menegatos?

6         A.    No.

7         Q.    After you called HR, did you discuss with anybody

8    else, did you discuss him attempting the same thing with

9    anybody else, did you file a complaint with OEO?

10        A.    I did, OEO.

11        Q.    When was that?

12        A.    I can't recall the date.

13        Q.    Was that specifically regarding Mr. Menegatos,

14   that was about his conduct, that OEO complaint?

15        A.    No, it was about the situation that had occurred

16   about the illegal hiring practice.

17        Q.    So it was regarding the guidance counselor

18   hirings?

19        A.    Yes.

20        Q.    Did it mention Mr. Menegatos --

21        A.    No.

22        Q.    His attempts to put you into the computer?

23        A.    No.

24        Q.    Going back to the hiring of Mr. Perez, once

25   again, do you believe that the hiring of Mr. Perez was

1      Q.      Do you know how Ms. Paulino came to apply for the

2    guidance counselor position at A. Philip Randolph?

3      A.      I do not know.

4      Q.      Do you know how she came to be hired?

5      A.      I do not know how she got hired.

6      Q.      Between the hiring of Mr. Perez and Ms. Paulino,

7    did you have any discussions with Mr. Rubio about seeking a

8    guidance position?

9      A.      I did not.

10      Q.      Did you speak to anybody else?

11      A.      I did not.

12      Q.      Did you take any actions at the school to seek a

13    guidance position?  Did you look for postings in regard to

14    A. Philip Randolph?

15      A.      Did I look for postings at A. Philip Randolph?

16      Q.      Yes.

17      A.      I looked at the -- at the vacancy board all the

18    time to see if anything was posted, but nothing was ever

19    posted.

20      Q.      What is that?  A vacancy board?

21      A.      Any time a position is available, the principal

22    will post it.  It's like a -- I don't know, a regular

23    bulletin board in the main office and post positions.

24      Q.      Is that just for positions at A. Philip Randolph?

25    Is that DOE-wide?

1    A.    They all showed up with Mr. Rubio.

2    Q.    So when he started?

3    A.    They all came --

4    Q.    The same time?

5    A.    All of them came with him.  Same time.

6    Q.    What about the supervisors?

7    A.    No.  Supervisors came at different times.

8    Q.    When was the most recent hire of the supervisors

9    you referred to?

10   A.    The most recent hire?

11   Q.    Yeah.

12   A.    I would say Daniel Calcano 'cause he started off

13   as an attendance teacher and moved into -- Mr. Rubio

14   appointed him immediately to be a supervisor.  Immediately.

15   Without even posting that position.

16   Q.    Immediately when Rubio started?

17   A.    No.  Immediately when he -- when he was able to,

18   I guess, finish all his -- his program of study.

19   Q.    Do you know about what time period that was?

20   A.    It had to be 2011 because it happened while he

21   was still in the building.  He left 2011.  So, yeah, it was

22   in 2011.

23   Q.    What about before -- before Calcano?

24   A.    Before?

25   Q.    Of the four individuals that I believe you

M. BASTIAN

1    Q.    Did you allege anything in this complaint other

2    than these guidance hirings?

3    A.    No.

4    Q.    Do you know what the result of the Special

5    Commissioner of Investigations investigation was?

6    A.    Yes.  Yeah.

7    Q.    What was that?

8    A.    I got a phone call from the investigator and it

9    said that it was unsubstantiated.  However, she said that

10   doesn't mean that something didn't happen.  She said that

11   we just don't have anything.

12   Q.    Did you do anything after getting that phone

13   call?

14   A.    I forwarded that to my attorney.

15   Q.    Did you ever apply again for guidance counselor

16   positions at A. Philip Randolph?

17   A.    With Rubio?

18   Q.    Sure.  Yes, with Mr. Rubio.

19   A.    No.  No, I never applied for anything.  It was

20   nothing to apply for.  There was no -- there was no posting

21   to apply to anything.

22   Q.    Were there any other hirings after Ms. Paulino?

23   A.    No.  There was no hiring after Ms. Paulino.

24   Q.    Did you apply after Mr. Rubio left for a guidance

25   counselor position at A. Philip Randolph?

M. BASTIAN

1    A.    I applied recently.

2    Q.    When was that?

3    A.    2014.

4    Q.    And what was the result?

5    A.    I received an e-mail from the principal's

6    secretary telling me that the position was filled.  I don't

7    know anything past that.

8    Q.    Do you know what month this was?

9    A.    June.

10   Q.    Are you alleging that this was discriminatory?

11   A.    No.

12   Q.    Did you apply for any other guidance counselor

13   positions at A. Philip Randolph High School after Mr. Rubio

14   left?

15   A.    Just the one that I mentioned just now.

16   Q.    Just in June of 2014?

17   A.    Yeah.

18   Q.    Did you apply -- continue to apply to other

19   schools?

20   A.    I did.  I continued to apply on -- looking again

21   through the DOE's directory and just, you know, reading up

22   on schools sometimes I'd be interested in, sending out my

23   paperwork to them.

24   Q.    Did you receive any of these positions?

25   A.    No.

1    Q.    Now, in total of all your guidance counselor

2    applications to DOE facilities, other than at A. Philip

3    Randolph, are you claiming that any of those was

4    discriminatorily denied to you?

5    A.    I never -- I never had an -- I didn't interview

6    for anything.  I sent stuff out.  Some schools would send

7    me replies that they don't have anything available right

8    now or we'll keep your stuff on file, things like that, but

9    it was never a chance where I interviewed.

10    Q.    Okay.  But are you claiming that it was -- that

11    you were discriminatorily denied an interview?  Are you

12    claiming that at any of these other positions?

13    A.    No, they just never answered.  There was no

14    response.

15    Q.    Okay.  So you're not claiming discrimination --

16    A.    Oh, no.

17    Q.    -- in regard to any of these other applications?

18    A.    No.

19    Q.    Okay.  Community associate hirings that you

20    mentioned in regard to Mr. Rubio, did all those take place

21    when he came to the school?

22    A.    They -- I'm assuming they were already hired

23    because they came with him.

24    Q.    So was that prior to 2008?

25    A.    Yes, it had to be.  Their hiring had to be

1  before -- I guess he -- they came with him.  When he --

2  when they -- when he came, they came with him.

3      Q.    Okay.  And he came around 2006; correct?

4      A.    Correct.  I guess they were already hired.  I

5  think the majority of them -- he came from Taft High

6  School, and I know the majority of them came from that high

7  school.

8      Q.    So these are people that he had worked with

9  before?

10     A.    He knew.  Mm-hmm.

11     Q.    What about the administrators, do you know if

12  those were people that Mr. Rubio had worked with before as

13  well?

14     A.    I know he worked with Gilberto Garcia because

15  Gilberto would always talk about how they knew each other

16  and worked with one another.  Mr. Pepin, not really.  I

17  didn't really have that much contact with him.  And

18  Mr. Casares, I believe, knew Mr. Rubio because he had

19  mentioned -- they belong to this -- this organization

20  called ADASA.

21     Q.    What is that?

22     A.    ADASA.  ADASA --

23              MR. BELDNER:  Can you spell it?

24              THE WITNESS:  Yes.  A-D-A-S-A.

25     A.    ADASA stands for the American Dominican,

1    A-D-A-S-A.  It stands for the American Dominican

2    Association for Supervisors and Administrators.  And I know

3    that Mr. Casares -- Mr. Rubio is the president.  You can

4    find all that information on the computer on Google.  He is

5    the president.  And Mr. Casares, Mr. Pepin, and Mr. Garcia,

6    and Mr. Calcano are all members of ADASA.

7        Q.    So did Mr. Rubio know them from that?

8        A.    Oh, yes.

9        Q.    You mentioned before being denied training

10    courses?

11       A.    Yes.

12       Q.    When was that?

13       A.    It was provided from probably from 2008 up until

14    I stopped asking.  I would ask for training in -- in Excel,

15    in Word, in anything that I felt would benefit me to

16    upgrade my skills, and I was always turned down.  I was

17    sent to a training for ATS.  That's only because it was Mr.

18    Menegatos wanted to give me a new job.  He wanted to give

19    me added responsibility, so he sent me out so that I could

20    learn it.

21       Q.    When was that?

22       A.    Probably somewhere near 2008.

23       Q.    You said that you stopped asking.  Do you know

24    when that was?  Was that around 2008?

25       A.    No, probably -- no.  Probably about 2010.  Yeah,

M. BASTIAN

1    I just gave up and stopped asking to go to workshops and

2    PDs because I always knew the answer would be no.  However,

3    I used to see the community assistants always being sent

4    out to go for training, and training that was -- there was

5    an arbitrations that was passed by the union, United

6    Federation of Teachers for school secretaries.

7         But at A. Philip Randolph, we had still people --

8    the principal violating the UFT arbitration rule that said

9    no other title could work in the school secretary's

10   capacity.  However, many of the community assistants were

11   still being -- were working in the capacity of a secretary,

12   which that's a job that required a license, and was sent

13   out on professional developments and all other workshops.

14   Q.    So during the 2008/2009 school year, do you know

15   what trainings you asked to receive?

16   A.    I would look -- anything that I could find.  If

17   it had to do with Excel, I wanted to broaden my experience

18   on that.  Anything that had to do with Word.  There were

19   other workshops that didn't really deal with the computer.

20   It was just about the DOE, period.  I wanted to do that but

21   never could.

22   Q.    Who did you ask?

23   A.    Oh, Mr. Menegatos.

24   Q.    During the 2009/2010 school year, did you ask

25   Mr. Menegatos to train -- attend any training sessions?

M. BASTIAN

1      A.      When I would find something, now and again I

2   would ask and see what he would say, but it was always

3   like, "No, you can't go.  We need you here.  You've got to

4   do this, you have to do that."  But in the meantime, I'm

5   seeing other people leave, and I really couldn't understand

6   why I, the -- the secretary with the license, I'm not being

7   afforded these workshops, but people who do not have these

8   workshops are being allowed to go.

9      Q.      Okay.  But during 2009/2010 school year, do

10  you -- do you remember asking Mr. Menegatos to --

11     A.      Yes, a couple times.

12     Q.      Do you remember what those trainings were?

13     A.      It was either about something I found on -- on

14  the computer about computers, expanding in Excel, expanding

15  in Word, or some other computer program I was trying to

16  learn.

17     Q.      Do you remember when you asked him?

18     A.      Not really.

19     Q.      Ballpark?

20     A.      What month?  You want a month?

21     Q.      If you can remember.

22     A.      Sometime in the fall, sometime in the spring.

23  October?

24     Q.      Of 2009?

25     A.      Mm-hmm.

1    Q.    What did Mr. Menegatos say to you in response to

2    your request?

3    A.    No.  You -- we need you here.

4    Q.    Did any other secretaries attend these trainings?

5    A.    Ms. Wyde (phonetic) is the -- two of us.  She's

6    the only other secretary.  Her -- she does payroll.  She

7    would go on -- on professional developments, but her

8    professional developments related directly to her.

9    Payroll.

10    Q.    Do you know if she asked to --

11    A.    Oh, I --

12    Q.    -- go to any of these trainings?

13    A.    I don't know.

14    Q.    Do you know if she attended any of these

15    trainings that you asked to attend?

16    A.    I know she went on a couple of them 'cause I

17    remember her leaving the building.

18    Q.    Which ones?

19    A.    It was one of them regarding computers.  Several

20    of them.

21    Q.    Do you remember which ones?

22    A.    I'm not sure which one -- which ones.

23    Q.    Was it a training that you had asked to attend?

24    A.    Yes.

25    Q.    And did Mr. Menegatos -- how did he respond?

M. BASTIAN

1    A.    I'm sorry?

2    Q.    In regard to that training that Ms. Wyde

3    attended, how did Mr. Menegatos respond when you asked to

4    attend?

5    A.    How did he respond to me?

6    Q.    Yes.

7    A.    He said, "No.  You need to stay here.  We need

8    you to stay here at school."

9    Q.    What is Ms. Wyde's race?

10   A.    African-American.

11   Q.    Are you claiming that these trainings were

12   discriminatorily denied to you?

13   A.    Yes.

14         I'm claiming that other -- other staff members,

15   community assistants were allowed to go to these trainings,

16   but I was not.  Many of these trainings pertain to -- to my

17   job responsibilities as a pupil accounting secretary and

18   learning more about different computer programs.  I was not

19   allowed to go.  Other members of the staff, community

20   assistants in particular, were allowed to go.

21   Q.    What basis do you believe that this was

22   discriminatory on?

23   A.    They were Hispanic.  They did not have a license.

24   They had no -- they had really no business at -- being at

25   these workshops.  They really did not because they did --

M. BASTIAN

1    they were not licensed to be there, so they -- they would

2    -- but they were allowed to go.  I had the -- the license

3    and was not allowed to go.

4        Q.    So race?

5        A.    Yes.

6        Q.    What about age?

7        A.    No.

8        Q.    Why do you believe it was based on race?

9        A.    Because the persons that I noticed leaving the

10   building to go to workshops were all Hispanic.

11       Q.    But you said Ms. Wyde went to one of these

12   trainings; correct?

13       A.    Ms. Wyde went to -- Ms. Wyde went to one, yeah,

14   but the majority of them that she would go to would be --

15   Ms. Wyde plays two roles:  She does payroll and she's a

16   principal secretary.  So there were times when she had to

17   go and -- and attend workshops for payroll.  However, she

18   did go to some of the computer workshops as well.

19       Q.    Other than the persons that were going to this,

20   is there any other reason why you think this was based on

21   race?

22       A.    I believe that Mr. Rubio did not want me to

23   advance my skills.

24       Q.    Anything else?

25       A.    No.

1    Q.    Did you talk to anybody about these training

2    courses?

3    A.    No.

4    Q.    Did you file an OEO complaint about these

5    training courses?

6    A.    I don't think I put that in my complaint.

7    Q.    You mentioned being transferred to, I believe,

8    pupil personnel, pupil records; is that correct?

9    A.    Pupil personnel, it's like a department.  It's

10   still in guidance.  That's another name for guidance, but I

11   guess I was transferred to records.

12   Q.    When was that?

13   A.    2008.

14   Q.    You also mentioned giving -- being given

15   undesirable assignments; is that correct?

16   A.    Yes.

17   Q.    Was that in connection to the pupil personnel

18   records?

19   A.    Yes.

20   Q.    To the transfer of the records room; is that

21   correct?

22   A.    Yes, it was a split position.  That split

23   position, what it did was -- well, of course, the records

24   room was a smaller room where I was in charge of

25   maintaining both current -- current and archives.  Archives

1    was -- is all students starting from 1983, our first

2    graduating class.  I was in charge of all that.  I'm sorry,

3    read that question to me again.

4         Q.    I was just asking -- you've made a mention of

5    being given undesirable assignments.  I want to know if

6    that was in regard to your transfer to pupil personnel

7    records or is that something in regard to something else?

8         A.    That was in regard to, I believe, my race.  I

9    also believe that that was in regard to -- I filed --

10        Q.    Sorry, I'm just asking about the actions

11   themselves --

12        A.    Okay.

13        Q.    -- right now.  So I'm just trying to figure out

14   what assignments, what actions --

15        A.    Okay.

16        Q.    And I'm trying to understand the timeline.

17        A.    Okay.

18        Q.    So that was my question.  The undesirable

19   assignments that you're referring to.  Let's put it this

20   way:  What assignments are you --

21        A.    Were they?

22        Q.    -- referring to?  Yeah.

23        A.    Okay.  I was assigned to work with five assistant

24   principals, every day a different assistant principal for

25   several hours during the course of the day.  The -- the

1   assignments that I -- that I received or I was supposed to

2   perform were menial for someone with my experience.

3       Q.      When were you assigned to these assistant

4   principals?

5       A.      When?

6       Q.      Yes.

7       A.      Oh, 2008.

8       Q.      And how long were you assigned to these assistant

9   principals?

10      A.      Meaning?

11      Q.      Up until when.

12      A.      Oh, up until 2010.  I would say '10, maybe '11,

13  I'm not sure.

14      Q.      And do you believe your assignment to these

15  assistant principals was discriminatory?

16      A.      I do.

17      Q.      Is that based on your race?

18      A.      Yes.

19      Q.      Is that based on age?

20      A.      No.

21      Q.      Is that based on anything else?

22      A.      It's based on race and it's based on the hostile

23  work environment that I -- that I was subjected to.

24      Q.      Other than the work environment that you just

25  mentioned, is there any other reason why you believe that

M. BASTIAN

1    this was discriminatory?

2        A.    Say that again, please.

3        Q.    Other than the work environment that you just

4    mentioned, is there any other reason why you believe that

5    this was discriminatory based on your race?

6        A.    No.

7        Q.    Being this assignment to these APs.

8        A.    I believe that it had to do with retaliation,

9    because I had filed two grievances on Rubio.  And after

10   that, he decided that he was going to change my -- change

11   my -- my job responsibilities.  When he moved me from the

12   college office, I had -- he moved me to put a school aide

13   there --

14       Q.    I'm sorry, when did he move you?

15       A.    I'm not sure of the date.

16       Q.    Is this 2008?

17       A.    Could be.  I'm not quite sure of the date.

18       Q.    Well, ballpark.  I don't need a month.  What

19   school year are we talking about?

20       A.    I don't remember.

21       Q.    What grievances are we talking about?

22       A.    The first grievance I filed was because he moved

23   me from the college office, and that's when he had given me

24   the assignments to work with the assistant principals.  I

25   was being praised for doing a wonderful job, and then all

1    of a sudden I was moved without provocation.

2              At that time, I worked with the assistant

3    principals doing very medial tasks; however, the community

4    assistants were still enjoying their offices and enjoying

5    their state-of-the-art equipment, and I was moving around.

6    I had no office at that time.  I was -- it was in between

7    being moved into the records room and not having an office.

8         Q.    Sorry, this was before you moved to the records

9    room?

10        A.    That's before I moved to the records room.  I had

11   no office.  I had a locker.

12             The other grievance was because I had requested

13   to speak with Mr. Rubio at a meeting, and he then had Elvin

14   Bautista, one of the community assistants, sit at the

15   meeting -- sit at the meeting.  And I thought that it was

16   his place to have him -- to ask him to please leave,

17   because he did not know what we were going to speak about.

18   The only person that's really entitled to be at a meeting

19   with me and the principal would've been my immediate

20   supervisor.

21        Q.    So these grievances, you just discussed what they

22   were in regard to, but who did you file these grievances

23   with?  Did you file these grievances with anybody?

24        A.    With the UFT.

25        Q.    Were they brought to the attention of Mr. Garcia?

1      A.     Mr. Garcia?  No.  Mr. Rubio?

2      Q.     No.  Mr. Garcia.

3      A.     He would not --

4      Q.     He wouldn't know about them?

5      A.     Well, he had no role in it.  He doesn't play a

6  role in grievances.

7      Q.     Okay.  But you were saying that Mr. Garcia is the

8  one that assigned you these undesirable assignments?

9  That's correct?

10     A.     No.  That was Mr. Menegatos.

11     Q.     Does Mr. Menegatos have any reason to know of

12  these grievances?

13     A.     He does.  I'm sorry, he did know about them.

14     Q.     How did he know?

15     A.     I am assuming that Mr. Rubio told him about them.

16     Q.     Did you ever discuss these grievances with

17  Mr. Menegatos?

18     A.     No.

19     Q.     Did he ever mention them to you?

20     A.     No.

21     Q.     When did you file the first grievance?

22     A.     I don't remember.

23     Q.     What did you do to file the grievance, what

24  actions did you take?

25     A.     The steps?

1    "Disturbing me?  Why would you be disturbing me?"  I said,

2    "The music is pretty loud, but, you know, you're not

3    disturbing me."  He said, "Are you sure?"  I said, "Yes, I

4    am sure.  You're not disturbing me."  And then he said,

5    "Are you sure I'm not disturbing you?"  I'm like, "Yes,

6    you're not."  So he said, "Oh," and then he's like looking

7    at me, and I'm like, "Why would you be disturbing me?"  And

8    then the look on his face was like, "Oh, you know why.  You

9    know why you're -- I'm disturbing you because -- I'm

10   disturbing you because it's classical music, and that is

11   not something that you understand."  It was very obvious.

12   His -- his behaviors were ridiculous.

13        Q.    Any other instances or comments?

14        A.    Outside of Malcolm X and the wig, lactose

15   intolerant, grits, nothing I can think of right this very

16   minute.

17        Q.    Okay.  So let's go through these then.

18              So the lactose intolerance comment, can you

19   explain what happened there?

20        A.    It was very early -- I get put to work very early

21   in the morning, probably like a little bit after 7:00, and

22   I had come in to -- to collect my mail and move my card.

23   He had just arrived, probably maybe 15, 20 minutes in, and

24   there was one of the community aides there, because she's

25   in charge of the doing, what they call, morning attendance

1   of staff members who are absent or late.  She has to make a

2   running log of that.

3          So then he called one of the school aides,

4   Mr. Waters -- Darius Waters, and Darius did not answer him

5   at first.  And then he called him again soon after, and

6   then Darius responded that he was in the -- in the men's

7   room, the bathroom.  So I'm still there collecting my mail,

8   and he says to him, "Hurry up.  Wherever you are, hurry

9   up."  So he said, "I'm in the bathroom.  I'm en route."  So

10  then Mr. Garcia decided to say, "Oh, don't they know

11  they're lactose intolerant?"  So then I look up and I said,

12  "Wow."  And he looks at me and says, "Oh, right,

13  Ms. Bastian?  Right, Ms. Bastian?"  And I said, "Well, who

14  are you referring to in terms of lactose intolerant?"  And

15  then he just marched out of the office.

16      Q.    What happened next?

17      A.    Oh, I reported -- I reported him to

18  Mr. Menegatos.  I reported the incident to Mr. Menegatos,

19  what had happened.

20      Q.    And what happened after that?

21      A.    He sent me the link to OEO to file the complaint.

22      Q.    And what about after that?

23      A.    I did not file a complaint in writing, but I

24  called.  I filed my complaint later, way later with OEO,

25  but it was during the time that I had gone down there

1  regarding the one time that I had went there.  I reported

2  that then.

3       Q.    I'm sorry, I didn't --

4       A.    I reported it verbally but not by the link to

5  OEO, the situation with the lactose intolerant.

6       Q.    Who did you speak to?

7       A.    I don't know.  I didn't -- I probably got the

8  information at home.

9       Q.    Do you know what date this was?

10      A.    It had to be a couple days after the incident

11  happened.

12      Q.    What was said during that conversation?

13      A.    I reported what happened and I was told to file

14  via the link.

15      Q.    The OEO person told you to file it via the link?

16      A.    Yes, but I never did.  I just -- I reported it

17  verbally.

18      Q.    Why didn't you file via the link?

19      A.    I don't know.

20      Q.    Did you do anything else after that?

21      A.    No.

22      Q.    I think you just made a reference to your other

23  OEO complaint that we discussed regarding the guidance

24  counselor positions; is that correct?  Did that happen

25  after this?

1    to eat and probably a milk product, so that prompted

2    Mr. Garcia to say, "Don't these people know that they're

3    lactose intolerant?"

4        Q.    Other than that, is there any other reason why

5    you think this comment was referring to African-Americans?

6        A.    Just outside of creating a hostile work

7    environment.

8        Q.    You mentioned an incident regarding classical

9    music?

10       A.    Yes.

11       Q.    Can you tell me about that?

12       A.    The classical music incident was when I had

13   just -- maybe a month later.  The way this office is

14   constructed, there's an office -- once you walk into the

15   suite, there's a huge office.  It's where I was placed,

16   with large panes.  So it's like a -- it's really like a

17   fish bowl.  You can like kind of see right in there because

18   there are three huge windows.

19       Mr. Garcia's office is more tucked away, so you

20   would really need to go into a small area to see his.  He

21   would blast music.  This particular day he blasted

22   classical music because he wanted me to hear it, and I did.

23   And so he hurries up and run over to me.  I'm not really

24   paying attention to him.  I'm just trying to do my job.

25   And he's saying to me, "Oh, I hope I'm not bothering you.

1    I hope I'm not disturbing you." And I said, "No, I'm

2    fine." Outside of the music, I mean, I hear it, it's loud

3    but not really. And he said, "Are you sure?" I said --

4    and I'm telling him -- I keep telling him, "I'm sure.

5    You're not bothering me."

6        What he was trying to get a rise out of me was to

7    say why this is bothering you because you are black. I'm

8    playing classical music, you know nothing about it. That's

9    what he was trying to do, and that's why I reported him to

10   Mr. Fanning about it immediately because these -- these

11   were part of the tricks and the games and the ploys that he

12   would do on a daily basis. Anything to offend, anything to

13   insult African-Americans, he would do it, from doing --

14   he -- at one point, he did a minstrel dance.

15       Anything that he could do, in his mind, he

16   thought it was just to make other people laugh when he had

17   an audience, but he -- what he was doing was insulting

18   African-Americans on a daily basis. I've seen him yell at

19   some of our school aides who are no longer there. They've

20   moved on to other school. These are adult men but they're

21   school aides, so he had an upper hand over them with

22   authority. So he would yell at them and demean them in

23   public.

24   Q.    Just backing up a little bit. So a month

25   later -- I don't know if we actually established when the

1    lactose comment was made.  What month and year was --

2        A.    That was in September because we had just got

3    back.

4        Q.    What year?

5        A.    Probably either '10 -- maybe '09 or '10.  I don't

6    remember.  It was at the beginning of the school year.

7        Q.    And the classical comment was?

8        A.    No, that came later.  That came probably in 2012.

9        Q.    Okay.  Going back to classical music comment, why

10   do you feel, specifically, that the classical music was

11   meant to bring up some sort of racial stereotype?

12       A.    The way that it happened.  He -- his running over

13   to my office.  He did not ask me am I being bothered

14   because of volume.  That's not what he asked.  He just

15   asked am I being bothered, is it bothering me, and I'm

16   telling him no.  It is loud, so if it's -- if I'm -- if

17   you're blasting the radio and I sit next door to you,

18   common sense would say, you come over, say, "Melissa, my

19   radio is on.  Is it too loud for you?  Is that bothering

20   you?"  That's what common -- a person with common sense

21   would do.  It had nothing to do with volume.  It had to do

22   with the kind of music that was being played.

23       Q.    Why do you think that was because of your race?

24       A.    Because he continued to create a hostile

25   environment.  Anything that he could do to get a rise out

1  of an African-American person, he was doing it.  Any

2  comment, any behavior, any situation that he could do

3  always was about race.

4       In his interactions with other people from, I

5  guess, Dominican Republic, it was always cordial.  It was

6  always a friendly, you know, how are you, kissy-kissy,

7  sitting down for lunch.  Any time there was a situation or

8  any kind of engagement with a person who was

9  African-American, it was always a hostile, argumentative,

10  rude, obligerant (sic).  His -- that's how his behavior

11  would be any time it had to do with African-Americans.

12       Q.   Were there any African-Americans that Mr. Garcia

13  got along with?

14       A.   If there are, I don't know any.

15       Q.   How was Mr. Garcia's relationship with Ms. Wyde?

16       A.   I don't really know because she was in an office

17  far away.  She really had no contact with people unless

18  people go to the principal's office, but I would have more

19  contact because I'm all over the school, you know, I work

20  with teachers.  I work with other counselors, so I'm all

21  over.  So chances are that she's going to have contact with

22  him unless he goes there.

23       In the time that I've seen him there, I've always

24  seen it as he goes, he gets what he needs and he leaves.

25  I've never seen him act up with her, and probably because,

1    you know, she's in the principal's office, but he does that

2    with other people all the time.

3        Q.    What other people are you referring to?

4        A.    School aides.  Well, they're gone now.  Darius

5    Waters was one of them.  Robert Sutton, he was another

6    school aide.  They've moved on to different jobs.

7        Q.    What was their race?

8        A.    African-American.

9        Q.    Are there any African-American teachers at

10   A. Philip Randolph?

11       A.    Yes.  Oh, Joyce Stannard.  She's number one

12   with -- there was a constant back and forth with

13   investigations with him.  He filed on her, she's filed on

14   him many times.  Joyce Stannard.

15       Q.    Any others?

16       A.    Teachers?

17       Q.    Any other African-American teachers other than

18   Ms. Stannard?

19       A.    It was Mrs. Self, Mr. Giscombe -- Delroy

20   Giscombe.  Those are the ones that I can think of right

21   now.  Gloria Thompson -- Dr. Thompson.

22       Q.    How is Mr. Garcia's relationship with these

23   people?

24       A.    Terrible.

25       Q.    What do you base that on?

1   A.   Race.

2   Q.   No.  What do you base your belief as to his

3  relationship with these people?

4   A.   Oh, they've all had some level of complaint with

5  him.

6   Q.   Is there any other reason why you believe that

7  Mr. Garcia's comment in regard to classical music was based

8  on race?

9   A.   Is there another reason why I think it's based on

10  race?

11   Q.   Why you believe it was discriminatory based on

12  race.

13   A.   He was directing it at me with -- with malice.

14   Q.   Any other reason?

15   A.   To create a hostile environment.

16   Q.   Any other reason?

17   A.   No.

18   Q.   What did you do after he made this comment to

19  you?

20   A.   I reported him to Mr. Fanning.  It's interesting

21  because the same day that he was getting or having

22  different staff members come in who were Hispanic, the

23  music was not blasting.  He would turn it down.  But when

24  no one was in the office, he would turn the music up just

25  for me.

1   Q.    When you went into his office, would he turn the

2   music down?

3   A.    Oh, I wouldn't go into his -- I could hear it.

4   Q.    Did you ever ask him to turn the music down?

5   A.    A couple of times.  Mr. Fanning had to come over

6   there a couple of times and have him turn it down as well.

7   Q.    Did you ask Mr. Garcia directly to turn it down?

8   A.    I would ask him to please turn it down.  He had

9   an assistant, which was Oscar Guillaume, working with him,

10  so I would not go.  It was in an office, in another office.

11  I would go and ask Mr. Guillaume to please go into Mr.

12  Garcia's office and turn that radio down because it's too

13  loud.  But outside of it, just the classical music, it was

14  timed on a timer for certain -- at certain times, it would

15  start to buzz as if he were -- as if it was at home.

16      So I remember saying to him one day because I

17  would come in very early, he wouldn't come in until way

18  after 9:00, and the radio went off for like an hour with

19  that buzzing.  And when he finally showed up, I said, "Why

20  don't you take that clock home or that radio because that's

21  something that you use at home, not in an office.  It's

22  been going off for an hour."  So he just laughed and

23  grinned at me and said, "Oh, I'm sorry."

24  Q.    This is Mr. Garcia?

25  A.    Yes.

M. BASTIAN

1      Q.      You said you reported -- after the classical

2  music, you reported to Mr. Fanning?

3      A.      I did.

4      Q.      What was said during that conversation?

5      A.      Mr. Fanning said, "Oh, he's still bothering you?"

6  And I said, "Yes, he's still at it."  And he said, "Okay.

7  I'm going to call him in," and that was it.

8      Q.      Did Mr. Garcia continue to play the music that

9  day?

10     A.      No, that -- after that, it was turned down.

11     Q.      After that incident completely or just that day?

12     A.      No.  For that day, he turned it down.  He would

13  turn it -- he would turn it back on, you know, in other

14  day -- on other days, but it wouldn't be that -- it was

15  loud.  It was too loud for an office, but it was not that

16  loud to the point where it was literally screeching in my

17  ear.

18     Q.      Did you file an OEO complaint regarding this?

19     A.      No, I did not.

20             MR. RENAGHAN:  We'll go off the record.

21             (Whereupon, an off-the-record discussion was

22             held.)

23     Q.      All right.  Ms. Bastian, we're back on the

24  record.

25     A.      Okay.

1    in a bar, maybe in, you know, in his backyard when he make

2    these kinds of statements, but not here.  He can't do that

3    here.

4        Q.    You mentioned Mr. Garcia's radio playing

5    generally, not specifically in regard to classical music,

6    but just him playing the radio generally.

7        A.    No, he would let it blast.  He would set it

8    time -- set it on a timer, like, maybe every half an hour.

9    As if you were trying to -- you're using it as an alarm

10   clock, and he would time it for half an hour, and it would

11   just start blasting, like, well, huh?  I have parents in my

12   office; I have students.  They're like, "Ms. Bastian,

13   what's that?"  I'm like, "That's over there.  It's coming

14   out of there."  "Who has a clock at work?"  I'm like, "He

15   does.  He has a clock at work."  He has an alarm clock at

16   work, and you know, people really couldn't understand who

17   brings an alarm clock to work.

18       Q.    Do you believe --

19       A.    And even if you did, why would you set it to go

20   off?

21       Q.    Do you believe that that was done to be

22   discriminatory based on race?

23       A.    Yeah, anything to bother me.  It was anything to

24   bother me to get me going.  He would do something like

25   that, and then I would complain, and then so he'll -- he'll

M. BASTIAN

1    have another something to come after me for or go after any

2    African-American for, something new for him just -- as long

3    as my life stayed miserable, he was fine.

4        Q.    Why do you think that him setting his radio was

5    based on your race?

6        A.    To get a rise out of me, to disturb me, to bother

7    me.

8        Q.    Do you believe it was specifically targeted

9    towards you?

10        A.    Yes, because there were other people in that

11    suite, there were other people in the school.  If he really

12    wanted to blast his radio, he could have taken it to

13    another department.  He could have taken it to

14    Mr. Calcano's office.  He could have -- there are other

15    people in that building where he could have taken that

16    radio, and if he wanted to really blast it and blast it in

17    their face or blast it next to where they were sitting and

18    trying to work.  He did it to me, because he was trying to

19    get a rise out of me and create a hostile environment.

20    That's it.

21        Q.    Where was the radio?

22        A.    There was a door, and he had a file cabinet, he

23    would place it right there on top of the file cabinet, and

24    that -- behind that door is where I sat.

25        Q.    What was on the other side of that door?

1    A.    His office. There was a door and two walls that

2  divided us.

3    Q.    So the radio was in his office?

4    A.    It was in his office. One time that I -- I had

5  to call Mr. Fanning over with another assistant principal,

6  Ms. Garcia, to hear it, and she was like, "What is going

7  on?" I'm like, "This has been going on for a long time,

8  and I'm really tired of it." So she said, "Oh, no, call

9  Mr. Fanning." I called Mr. Fanning. Mr. Fanning, with his

10  key, opened up the door, and I don't know what happened to

11  the radio after that. All I know, the radio was not

12  playing any more.

13      The very next day, Mr. Garcia came in -- because

14  he had gone out for PD, but I was in the building, and he

15  said, "Do you know what happened to my radio?" And I said,

16  "No, I don't know." He said, "Did you see anybody come in

17  my office?" I said, "I didn't see anybody go in your

18  office. I don't know what happened," but apparently

19  something happened to that radio.

20    Q.    Mr. Fanning did something?

21    A.    I guess so. All I know, I didn't hear it any

22  more.

23    Q.    Other than what you mentioned, is there any other

24  reason why you think that him playing his radio was based

25  on your race?

M. BASTIAN

1    A.    Outside of creating the hostile environment and

2    the race, no.  I couldn't understand why he -- he couldn't

3    have taken his radio somewhere else.  A. Philip Randall is

4    six -- six flights in that floors, in that school.  There's

5    a number of places he could have taken that radio if he

6    really wanted to blast it, but he continued to do it there

7    next to me.

8         Mr. Guillaume, his assistant, he never disturbed

9    him.  He would buy him lunch.  They would go and lock the

10   door, and they would eat and have -- the radio would be on,

11   but the radio would be low.

12   Q.    Was Mr. Guillaume ever there when this radio went

13   off?

14   A.    Oh, yes.  Yes.  A couple of times I had to ask

15   him to go in there and turn it off.

16   Q.    Was Mr. Guillaume ever there when the radio was

17   blasting?

18   A.    Yes, he was.

19   Q.    Where does Mr. Guillaume sit?

20   A.    At the time when -- he's moved since then.  He's

21   --

22   Q.    At the time.

23   A.    There was -- inside, geographically, he -- okay,

24   let me see what I'm trying...

25        There was an adjacent office next to Mr. Garcia,

M. BASTIAN

1    so he would've sat in the outside -- the outer office.

2        Q.    The outer office of what?

3        A.    The outer office of Mr. Garcia's office.  That

4    office was enclosed.  When you walk in, just try to draw

5    a -- when you walk in, you would see a huge office with

6    three large panes, which was my office, but to the back of

7    that office is where Mr. Garcia sat, and there was another

8    office adjacent to it where Mr. Guillaume sat.

9        Q.    So he was on the opposite side of Mr. Garcia's

10   from you?

11       A.    Yes, he was.

12       Q.    So Mr. Guillaume would hear the radio whenever it

13   was blasting?

14       A.    He can hear it.  There's no way he could have --

15   he could not have heard it.

16       Q.    And what was his race?

17       A.    Hispanic.  Dominican.  And he was performing a

18   duty that he had no license to do.  School secretary

19   licensed person was supposed to be in charge of what he was

20   doing.

21       Q.    How did that affect you?

22       A.    What?  The fact that he was doing --

23       Q.    Or did it affect you at all?

24       A.    Yes, it did.  But I did not like it.

25       Q.    But did it affect your job at all?  Did it affect

1   your responsibilities?

2      A.    No, it did not affect my responsibilities.  It

3   affected me because I know that I'm credentialed and I know

4   that I had to go through all the processes of retaining my

5   credentials, and someone else is now in a position to do

6   responsibilities of a credentialed person, and he does not

7   have this license.

8      Q.    Did you go to OEO about the radio going off in

9   Mr. Garcia's office?

10     A.    No.

11     Q.    And you mentioned something about you can't go to

12  OEO every --

13     A.    When I went to --

14     Q.    -- all the time?

15     A.    Mm-hmm.  I went to Mr. Fanning because I'm like,

16  okay.  Now, remember, I'm listening to all the other people

17  in the school and all their reports, OSI and OEO and all

18  that stuff.

19         We have a number -- we have a number of teachers

20  there who were under investigation, so I'm in charge of all

21  subpoenas coming from the Department of Education, law

22  department.  I'm on the phone, speaking about these

23  subpoenas and following up with attorneys.  So at that

24  point, the school is like a -- just a big court.  I'm

25  feeling like I'm working in a courthouse now, and not a

1   school.

2          Between what's happening to me and what's

3   happening to other people, because all the people that I'm

4   surrounded with, they're all having -- they're all under

5   investigation now. Every African-American that's

6   associated with me at A. Philip Randolph, they're all under

7   investigation.

8      Q.   Other than the one OEO complaint that we talked

9   about before, that guidance complaint, did you file any

10  others?

11     A.   I did not.

12     Q.   Okay. And then other than -- and I believe you

13  said something about Fanning telling you about things that

14  Garcia had done; is that correct? Is that accurate?

15     A.   He -- yes, he may have mentioned. He said,

16  "Yeah, I really do need to go speak to him," because he

17  talked about -- not in detail. He said, "But he's -- he's

18  made some statements where I had to go and straighten him

19  out regarding the same kinds of things."

20     Q.   Did he say what that was in regard to?

21     A.   No, he -- no, he never mentioned names and he

22  never mentioned the situation, but he said, "I really had

23  to speak to him." Because when I went to him, he was

24  upset. He was like, "I just spoke to him about having made

25  these comments to somebody else." And I'm like, "Yeah,

1    could -- yeah, 2011.

2        Q.    Okay.  And what happened after Mr. Fanning came

3    and heard this radio playing?

4        A.    He came in, he took his key and went in that

5    office, and then after that, I didn't hear the radio any

6    more.

7        Q.    Did you ever hear the radio after that?

8        A.    Very low.

9        Q.    Okay.

10       A.    Very, very low.  It was no more blasting of it

11   after that.

12       Q.    You mentioned a comment regarding grits?

13       A.    Oh, yeah, the grits.

14       Q.    Can you tell me about this?

15       A.    Sure.  I went into -- I was -- okay.  Mr. Garcia

16   is a assistant principal of security.  So any time I would

17   receive a subpoena, there are different departments I would

18   have to contact to get information.  These particular

19   children -- they were something that happened regarding

20   disciplinary, so he needed to run an ORS report.

21            The ORS report is the online reporting system for

22   suspensions, infractions, and all that.  He's the only one

23   who is able to do that.  I needed to get that from him

24   because I had a courier coming to pick up the information

25   that needed to be delivered to -- now, this is December

1   7th.  This is like the day Mr. Fanning started.  I remember

2   this one really good.

3           He needed to -- he was supposed to give it to me

4   the day before but of course, you know, he was doing other

5   things instead of that.  So I had to report to him, and I

6   remember I didn't want to go there 'cause I never liked to

7   be in the office with him by myself.  I didn't know who was

8   going to be in that office with him.  So I had went to Mr.

9   Menegatos first, and I said, "You know, the courier is

10  coming for this subpoena.  We need to have this done now.

11  I need for you to walk with me to Mr. Garcia's office right

12  this minute."  Because he knew I did not go in there by

13  myself.

14          So he said, "Okay.  Come on.  Let me go with

15  you."  He walked down with me.  We went in his office, but

16  Ms. Manrique was there.  They were eating.  There's a food

17  from the Caribbean, also Hispanic-Caribbean too, that --

18  and my family eat it as well because my family comes from

19  the Caribbean.  So when I opened the door, I saw it, and I

20  said, "Oh, you're having breakfast?"

21          It's -- it's a food called mangu, bananas and

22  sausage, and that's what people eat.  So he said, "Do you

23  want some?"  And I said, "No.  I just want to get the

24  information that I need to get from you, because the

25  courier is on his way, and I need to get this stuff over

1    because -- "

2       Q.    I'm sorry, who said, "Do you want some?"

3       A.    He -- Garcia.

4       Q.    To you?

5       A.    Yeah.

6       Q.    Okay.

7       A.    Do you want some -- some mangu.  I said, "No.

8    Just give me the envelope," which I should have had the day

9    before.  Okay.  So, he -- I said, "No, I don't.  I do not

10   want any, thank you.  Just give me the information."

11          Now, one of the community assistants,

12   Ms. Manrique, is sitting there because there was a full

13   spread of food out because there was a lot of food going on

14   in that school.

15          So a teacher walks in with me, Ms. Conquest.

16   She's an African-American teacher.  She walks in with me,

17   along with Menegatos.  We're walking in together.  When he

18   offered me the mangu, I said, "Oh, no.  No, thank you.

19   Please just give me the package so I can give it to the

20   courier because they're coming."  They don't wait long.

21   They need to get it and go.  So he said, "Okay."  But he

22   does not -- he doesn't go look for it.  He said, "You know

23   what, since you don't want the mangu, I'm going to go buy

24   you some grits."

25          So I'm just now standing there, and Mr. Menegatos

1  is standing there with that look on his face, like oh, "S",

2  here we go.  Because he -- he sees it.  Now, he's like oh,

3  oh, it's coming.  And Ms. Conquest is just sitting --

4  standing there in total silence.  So I said, "Grits?"  I

5  said, "I don't eat grits, Mr. Garcia."  He said, "You sure?

6  I'm going to buy you some grits."

7           I'm just now just standing there.  I really don't

8  like even know what to do with this anymore.  This is like

9  outrageous.  In my mind I'm thinking, "When is this ever

10 going to stop?  Like, when is he really going to stop

11 this?"  So when all -- everything is said and done, he

12 finally say, "Oh, go to your office.  I'm going to send you

13 the stuff by e-mail," and I got it by e-mail.  But after I

14 got it, I stormed into Mr. Menegatos' office and I reported

15 what happened.

16           Again, he sent me the link, Chancellor's

17 regulations, A-30.  The link again came.  And I did go

18 online, and I did report the whole thing, and I did get a

19 call from Downtown.  I also told Mr. Fanning about it.  And

20 he said okay.  Okay.  That was it.  Just okay.

21    Q.    Sorry, who said that?

22    A.    Oh, the principal.

23    Q.    Mr. Fanning?

24    A.    Mm-hmm.

25    Q.    So let me make sure I just have the people -- the

1    cast correct.  So Ms. Manrique, Mr. Menegatos, and Ms.

2    Conquest were all in the office when this happened?

3        A.     Yeah, Manrique.  M-A-R -- wait, wait.

4    M-A-N-R-I-Q-U-E.

5        Q.     Okay.  Excuse me.

6               And then afterwards, you went and spoke to

7    Mr. Menegatos?

8        A.     Went to speak to --

9        Q.     Well, he was already there, so you -- you went to

10   his office?

11       A.     Yeah.  He was there because, remember, he walked

12   me down.

13       Q.     Right.

14       A.     Because I refused to go into Mr. Garcia's office

15   by myself.

16       Q.     Right.

17       A.     For about two years I would not go in there

18   alone.  Because I would not go in his office 'cause I

19   didn't want to hear any comments.  I was really -- I was

20   really sick of it by that time.  It was making my stomach

21   turn to have to hear this all the time.  This ridicule,

22   other people laughing, 'cause that's what he was doing,

23   wanting other people to laugh about it, and it was

24   really -- I couldn't take it anymore.  So I needed now

25   proof.

1    And I also said in that complaint, "Do you
2  realize that there are three people listening to you?"  In
3  my complaint I write that because I'm letting him know you
4  have witnesses now, people are listening to you make these
5  statements.  This is not me just any more running to Mr.
6  Fanning, and Mr. Fanning running to you, ha, ha.  That's
7  not happening no more.  What's happening now is, I am now
8  logging and letting you know that there are people who are
9  going to be testifying against you because you are now out
10  of control.

11    Q.    Okay.  So Mr. Menegatos, you spoke to
12  Mr. Menegatos about this.  What did he say?

13    A.    When I went to his office, he said, "Calm down."
14  He said, "I'm going to send you the link."  He came to my
15  office twice that day to make sure that I was going to
16  write this up.

17    Q.    And this is the link to the internal -- the DOE
18  internal OEO complaint system; is that correct?

19    A.    Yeah.

20    Q.    And you said that you filed the complaint using
21  that link?

22    A.    Yes.

23    Q.    And what did you state in that complaint?

24    A.    What happened.  Everything.  He said he was going
25  to buy me grits, everything.

1          THE WITNESS:  Right?

2          MR. SULLIVAN:  Off the record.

3          (Whereupon, an off-the-record discussion was

4          held.)

5     Q.    Ms. Bastian, we're back on the record.

6     A.    Okay.  Thank you.

7     Q.    All right.  You also mentioned before an instance

8   where Mr. Garcia wore an afro wig?

9     A.    Yeah.

10    Q.    Is that correct?

11    A.    Mm-hmm.

12    Q.    Do you remember when that was?

13    A.    That was sometime during -- it had to be sometime

14  there in the summer, towards the end of the school.

15    Q.    Of what year?

16    A.    It would -- would have to be 2010 or -- either

17  2010 or 2011.

18    Q.    Can you tell me about what happened?

19    A.    I was at a meeting with the principal and other

20  people, and he showed up dressed up in a afro wig with a

21  pick in it.  Not a pick -- a pick.

22    Q.    Okay.  What happened next?

23    A.    Oh, he looked at me; I looked at him.  I was,

24  like, "What the -- what is that?"  And he put his fist up

25  and said fight the -- "More power to people," something

1   like that.  One of those statements he made with a fist up.

2   And I just said, "Oh, boy.  What's this?"

3       Q.    Anything else happened after that?

4       A.    I remember Mr. Fanning saying -- he said, "Oh,

5   boy."  I remember him looking at me and saying, "Oh, boy."

6   I'm, like, reading his facial expression because now he

7   knows something's going to happen, and I'm saying uh-uh,

8   uh-uh, and that's it.  I can't -- I can't remember anything

9   else from that incident.

10      Q.    Do you believe this action by Mr. Garcia was

11  discriminatory?

12      A.    Yes.  Yeah.

13      Q.    Is that on the basis of race?

14      A.    Yes.

15      Q.    Anything other than race?

16      A.    Again, ridicule and creating hostility again.

17      Q.    Anything else?

18      A.    No.

19      Q.    What about age?

20      A.    No.

21      Q.    Okay.  What led you to the conclusion that this

22  was based on race?

23      A.    What led me to that because that was a day that

24  the school have these designated days for kids towards the

25  end of the school year.  And that was -- those days are for

1   the kids to dress up in different themes; it's not for

2   adults.

3           As long as I've been at A. Philip Randolph, I

4   can't remember -- 1995, so 2014, it's going to be 20 years

5   for me coming up.  I have never, ever seen an adult dress

6   up on those days.  Those days are sponsored for the kids

7   because those are like their end-term, you know, activities

8   for them to leave.

9           Okay.  If you -- even if you -- you're an adult

10  and you want to dress up, but why would you wear that?  Why

11  would you wear -- he was wearing a dashiki too, by the way.

12  Why would you wear an afro wig and put a pick in it and

13  raise your hand up like this (indicating), "More power to

14  the people.  Power sister."  One of those ridiculous

15  statements he made.  Why would you do that?  You are the

16  only adult dressed up.  Okay.  If you wanted to dress up,

17  but why would you choose those clothing?  He could have

18  been anything.  He could have dressed up like a Leprechaun,

19  but if he had done that, he would have insulted my

20  principal.

21      Q.   Other than --

22      A.   He knew not to do that.

23      Q.   I take it what you're referring to is stereotype?

24      A.   Yes.

25      Q.   Other than that, any other reason why you believe

1    it was based on race?

2        A.    He likes to dress up because he likes to mimic

3    and mock black people.  It makes him -- he feels great

4    about it.  He feels good about doing stuff like that.

5    Okay.  If I -- I could have come in with an afro wig if I

6    wanted to.  I didn't do that, but he did it.  Why?

7    Because, again, he -- he goes again with his mockery and

8    his insulting behaviors, and knowing that he's going to

9    continuously get away with this.  That's why he keeps doing

10   it.

11       Q.    Okay.  Anything else?

12       A.    No.

13       Q.    Sorry.  Just to jump back.  I realized I skipped

14   a question in regard to grits.

15             Did you ever talk to Mr. Garcia about eating

16   grits?

17       A.    I've never had grits in my life.

18       Q.    So that's a no?

19       A.    We don't -- no.  I've never had grits.  I don't

20   know how they taste.

21             MR. BELDNER:  His question was whether you

22             ever talked to Mr. Garcia about grits.

23             THE WITNESS:  No, I've never spoken to him

24             about grits.

25       Q.    Has anybody else at A. Philip Randolph spoken to

1  you about grits before?

2      A.      In side conversation, what do -- I'm not

3  understanding.

4      Q.      Just during any conversation at A. Philip

5  Randolph, has the topic of grits come up?

6      A.      No.  No, I've -- I've never had -- I've had --

7  I've had a conversation about grits when this -- when that

8  happened.

9      Q.      But before that?

10     A.      No.

11     Q.      Okay.  Going back now.

12             With the afro wig and the pick, that incident,

13  who else was in that room when Mr. Garcia came in?

14     A.      Mr. Fanning was there.  Nicole McShall.  Was this

15  Dr. Lowenthal?  Sonia Burke.

16     Q.      Anyone else?

17     A.      There was another person, but I do not remember.

18     Q.      What's Ms. McShall's race?

19     A.      African-American.

20     Q.      And what do you base that on?

21     A.      Race.

22     Q.      Dr. Lowenthal's race?

23     A.      Can I say Jewish?  Can I use that?  Is that a

24  race?  Can I say that's his race?

25     Q.      Is that what he identifies himself as?

1    A.    He is Jewish, yes.

2    Q.    What about Ms. Burke?

3    A.    African-American.

4    Q.    Did you file a OEO complaint after Mr. Garcia

5    came in with the wig?

6    A.    No.

7    Q.    Did you mention that in any OEO complaint?

8    A.    No.  Told the principal.  He was there.  So he

9    saw it.

10    Q.    Did you ask Mr. Fanning to do anything about it?

11    A.    No.

12    Q.    Did anyone say anything to Mr. Garcia?

13    A.    About?

14    Q.    About the wig and the pick.

15    A.    In what capacity?

16    Q.    The people that were there, did anybody say

17    anything to him about what he was wearing?

18    A.    Oh, like -- oh, do you like -- you look nice,

19    something like that, or you're funny?

20    Q.    Anything at all?

21    A.    No.  No one said anything.

22    Q.    Did anybody talk with you about that incident?

23    A.    I spoke with Ms. Burke about it when -- and how

24    ridiculous he looked, and I spoke to Mr. Fanning about it.

25    Q.    When did you speak to Mr. Fanning about it?

1    A.    The same day.

2    Q.    What did he say?

3    A.    Nothing.

4    Q.    What did you say to Mr. Fanning?

5    A.    "Why is he wearing that wig?  Why would he come

6    into school wearing an afro wig with a pick in it on the

7    day where the kids are dressed up?"  I said, "There's no

8    other administrator.  You have one, two, three -- you have

9    six administrators in here.  None of them are dressed up.

10   He's the only one dressed up."  I could see if it was for

11   students and staffs, or maybe if it was another

12   administrator dressed up.  I said, "You're not even dressed

13   up."  Nobody is dressed up but him wearing that afro wig

14   again.

15   Q.    Did you ask Mr. Fanning to say anything to him?

16   A.    No.

17   Q.    All right.  You mentioned an incident where

18   Mr. Garcia said something about African-American women in

19   the projects.

20   A.    That was just -- when I was assigned to him, part

21   of that responsibility that I had, when I was assigned to

22   work with the different principals, he would -- he asked me

23   that several times.  Why does black girls wear -- put

24   Vaseline on their face and tie their hair, their heads,

25   with head scarves when they're about to fight?

1    Q.    When was this?

2    A.    Like 2008, 2009.  That's when I was assigned to

3    him.  What I would do, I would go to their office,

4    whatever -- whoever the assistant principal was, and for

5    the time I was assigned to them, I would just report to

6    their office.  And his office was usually filled up with

7    food, not for me, for all his friends.  It would be --

8    yeah, it would be ongoing Spanish for the whole time I was

9    there, which was usually for hours, and socializing.

10    Q.    So was this during the 2008/2009 school year?

11    A.    It was during the time that I was assigned to the

12    assistant principals, and I know it encompassed that time.

13    It might be more, but I don't know for sure.

14    Q.    By more, you mean after?

15    A.    More meaning 2010.  It could have went into that

16    as well, but I don't remember.

17    Q.    All right.  Was this comment made more than once?

18    A.    Yes.

19    Q.    Who else was there when this has been said?

20    A.    These comments were usually made when his --

21    other Hispanics were there, but that was never a problem to

22    them.  They didn't see that as being insulting.  They just

23    thought --

24    Q.    Do you remember their names?

25    A.    Yeah.  Ms. Manrique -- Tatiana Manrique.  This

M. BASTIAN

1    woman is now retired, Ms. Hernandez.  She retired about

2    three years ago.

3        Q.    Anyone else?

4        A.    Yes, there were.  I don't know their names.  We

5    had sub teachers, substitute teachers that would come.  A

6    lot of time -- they were always Hispanic and they would

7    spend a lot of time in his office.  I never really

8    understood when they taught because they spent a lot of

9    time sitting down in his office.  And that's when the -- it

10   was a lot of socializing and food eating in his office.  Or

11   another young woman named Wendy.  She's still at the

12   school.  She's a school aide, Wendy McAdoo.  She often hung

13   out with Mr. Garcia.

14       Q.    What's her race?

15       A.    Dominican.

16       Q.    And the other substitutes --

17       A.    Ms. Hernandez.

18       Q.    Yes, Ms. Hernandez.

19       A.    Ms. Hernandez is Dominican.  She's now retired.

20   She's been retired for three years.  The other ones, I

21   don't know them.  They were substitute teachers, so they

22   would come and they -- their English was -- you could not

23   understand them at all.  I mean, you really couldn't.  So

24   there were subs.  I never, you know, I knew who they were,

25   but I never engaged them in conversation because I knew

1    that they could not speak English.

2        Q.    And they were present when --

3        A.    Oh, yeah.

4        Q.    -- when Mr. Garcia asked this?

5        A.    Yeah.  Yeah, they were there.

6        Q.    So what else was said other than this question,

7    or what was your response to this question?

8        A.    Read it again?

9        Q.    What was your response to this question?

10             MR. BELDNER:  The question that Mr. Garcia

11             made?

12             MR. RENAGHAN:  The question that Mr. Garcia

13             posed about African-American women in the

14             projects.

15       A.    Oh, I told him I own my apartment because I

16   remember going to Mr. Fanning about that.  I said, "I don't

17   know anything about that.  Every apartment I ever lived in,

18   I owned, so I don't know anything about that."  And, yes, I

19   did report it to the principal.

20       Q.    Who was the principal at that time?

21       A.    Mr. Fanning.

22       Q.    I'm sorry, when did this take place?

23       A.    It was over time.  You know, I was assigned to --

24   when -- being assigned to an assistant principal means you

25   go to the office and you do whatever they want you to do.

M. BASTIAN

1    That's why I complained because a lot of my stuff was

2    menial.  I was like making copies and photocopying books,

3    and I'm like, "What's going on," when community assistants,

4    I thought, should have been doing that, not a licensed

5    secretary.

6         Q.    But the principal that you reported this to was

7    Mr. Fanning?

8         A.    Yes.

9         Q.    And what did Mr. Fanning say?

10        A.    Nothing.

11        Q.    Nothing at all?

12        A.    He shook his head.

13        Q.    Did you ask him to do anything about it?

14        A.    No.  No.

15        Q.    Did you file a complaint about this?

16        A.    No.

17        Q.    Did you include it in your OEO complaint?

18        A.    No.

19        Q.    You said that he had asked you this multiple

20   times.  What was your response the second time he asked

21   you?

22        A.    I'm sorry, say that again, please.

23        Q.    You said that he had asked you this question

24   about African-American women in the projects multiple

25   times.  What was your response the second time?

M. BASTIAN

1    A.    I told him I don't know anything about that.

2    Q.    Did you ever ask him --

3    A.    I said, "Why are you --"

4    Q.    -- to stop asking you?

5    A.    Yeah, I did.  I said, "What do you -- why are you

6    asking me these things?  You need to go find somebody that

7    live in housing, in public housing, and ask them that.

8    Stop asking me."  But it would always be passed off as a

9    joke, and then, you know, he'll leave it alone.  And then

10   some other time he'll come back and ask me again.  I'd say,

11   "I don't know anything about that."

12   Q.    Was he asking you specifically or was he asking

13   the group?

14   A.    I was the only one there.  He was --

15   Q.    I thought you said that there were --

16   A.    There were other people there, but he's -- no,

17   he's asking me.

18   Q.    Okay.

19   A.    He's looking at me and asking me.

20   Q.    Do you believe that this question was

21   discriminatory?

22   A.    Yes.

23   Q.    Was that based on race?

24   A.    Yes.

25   Q.    Was it based on anything other than race?

M. BASTIAN

1    A.    Race and to create ridicule, to -- he loved an

2    audience.  It was fun for him to -- if he can humiliate any

3    person of African-American descent and get a rise out of

4    his group, he loved that.

5    Q.    Anything else?

6    A.    No.

7    Q.    Did you talk to anyone else about this?

8    A.    Probably Sonia Burke.

9    Q.    Do you recall?

10    A.    I'm sorry?

11    Q.    Do you recall actually having a conversation

12    about it?

13    A.    Yeah.  Yes, I recall.

14    Q.    What was said?

15    A.    Mr. Garcia said he's up to his tricks again.

16    He's still with his comments and making jokes and trying to

17    embarrass me.

18    Q.    All right.  You referred to an incident with a

19    Malcolm X poster; is that correct?

20    A.    Yes.

21    Q.    And when was that?

22    A.    I don't remember the date.  I can't.  It happened

23    around the time of the Tray/OFT Martin shooting.  He hung

24    up this huge poster of Malcolm X.  It's -- I -- it's hard

25    for me to say, I can't say anything.

1          I had three huge windows, glass panes, and

2    Mr. Fanning did not want anything covered.  We were not

3    allowed to cover anything.  So my office was like a fish --

4    a fish bowl because he said covering up windows implied

5    something was going on.  So really, I mean, I could kind of

6    look out and see everything that was happening in the whole

7    suite.

8          So I'm seeing this poster he put up.  I'm like,

9    "What is that?  What is he doing now?"  I'm sorry.  It was

10   always one thing after another.  So I'm seeing it being

11   tacked up, and I'm seeing this Malcolm X poster, and I'm

12   like, oh, boy.  This is not the time to do that.

13         So I called people down.  I was calling people

14   down to my office, and I said, "Look at that."  And they

15   were like, "Wow, who put that up there?"  And I'm like, "He

16   did it."  And they're saying, "He put that up there?  Mr.

17   Fanning let him put that up there?"  I'm like, "He put that

18   up there."  Because I want people to know that was not me.

19   I didn't put that up.  And he came -- after he put it up

20   and everything, and I'm watching him do it, he goes back to

21   his office and comes back and say, "Oh, do you like my

22   poster?"

23   Q.    What did you respond?

24   A.    "Why would you --" I said, "Why did you put that

25   up there?  Why would you put that picture up there?  No, I

1    was a good idea at all.

2        Q.    Why didn't you think it was a good idea?

3        A.    Because of the Trayvon Martin situation and

4    there -- people were -- were upset.  The kids were running

5    around with hoodies on.  Malcolm -- there are two Malcolm

6    Xs, not everybody know of a transformation Malcolm X.

7    There are people who know -- want to know the Malcolm X

8    prior to his incarceration.  I studied Malcolm X.  That

9    Malcolm X is the Malcolm X that we would -- we would term

10   the racist Malcolm X.  But then after he went to prison and

11   he came out, he because a different Malcolm X, the Malcolm

12   X that was not espousing by any means necessary, and all

13   that other kind of stuff.

14        So which -- depending on who you are, if you're a

15   person 18 and under, you don't know that other Malcolm X.

16   I'm not 18 and under.  I may look it.  So they don't know

17   that, and then on top of what just happened.  You're

18   talking about young people.  You're talking about black

19   men.  Let me be that specific.  With Tray/W Martin just

20   being killed, and now you have Malcolm X poster up.  Is

21   that responsible?

22        Q.    Which Malcolm X or -- was the poster depicting?

23        A.    There's only one Malcolm X poster.

24        Q.    Sorry, you--

25        A.    There's -- you will never see a Malcolm X with an

1    afro.  Is that what you mean, like a before and after

2    Malcolm X?

3        Q.    Right.  So you were describing a before prison

4    and after prison, what --

5        A.    No, his -- his thought patterns.

6        Q.    Did you recognize the picture from before prison

7    or --

8        A.    It's one -- it's only one.  It's not going to be

9    ever -- you wouldn't ever see a different -- you're never

10   going to see, like I say, a Malcolm X with a big afro with

11   a dashiki.  Is that what you mean?  And now a Malcolm X

12   with a suit and a tie?

13                MR. BELDNER:  We got it.

14                THE WITNESS:  I'm sorry.

15       Q.    Is there anything about the picture which would

16   indicate to you which phase of his life that this picture

17   was --

18       A.    It says, "By any means necessary."

19       Q.    Okay.

20       A.    Yeah.

21       Q.    So I take that to mean earlier phase of his life?

22       A.    Yes.  But if you're 18 and under, you're not

23   going to know -- no, you have to be an older person to have

24   studied him.  The kids don't know that Malcolm X.  They

25   know the earlier Malcolm X before he was incarcerated

1  because that's what really -- that was the revelation.

2          If you read it -- if you read him, you'll see

3  what happened to him.  And then he started to espouse

4  something differently, but they don't know that one.  So I

5  didn't think it was appropriate to have that up there,

6  especially at this time.

7          Now, reversed, had I put that up there, he would

8  have contacted OEO on me.  He would have -- yes, he would

9  have done that because he would have turned it around and

10  he would have said that I was espousing and I was creating

11  a riot.  That's what he would've done to me.

12     Q.    Do you believe that this action was

13  discriminatory?

14     A.    Yes.

15     Q.    Do you believe that it was based on race?

16     A.    Yes.

17     Q.    Anything other than race?

18     A.    Again, to start his -- to create his hostile

19  environment.

20     Q.    Anything else?

21     A.    And I did say something to him, by the way.  I

22  said, "Why don't you put up a picture of Dr. King?  If you

23  want to put somebody up, put him up."  Walked away.

24     Q.    Did he respond?

25     A.    He walked away.  Yeah, he responded.  He walked

1    away.  That's what he did.

2        Q.    The action being, putting up the poster, correct?

3            MR. BELDNER:  You should probably ask the

4        question.

5            MR. RENAGHAN:  Sorry.

6        Q.    You said you believe this is discriminatory based

7    on race.  The action being, putting up the poster, that's

8    what you believe is discriminatory based on race; correct?

9        A.    Him telling me to fight the power.

10       Q.    Him saying, "Fight the power."  Anything else?

11       A.    I'm sorry.  This is bringing back memories of

12   this.  Outside of race and he creating this environment,

13   no.

14       Q.    Other than making that comment to Mr. Garcia

15   about putting up a poster of Martin Luther King, did you do

16   anything else after this?

17       A.    Did I do anything?  I told Mr. Fanning about it.

18       Q.    What did you say to Mr. Fanning?

19       A.    I said you -- I called him.  I said, "You need to

20   come over here and see this."  He came over.  He looked at

21   it, and he walked out.  I don't know what happened because

22   the poster was taken down.  I don't know who took it down.

23       Q.    When was it taken down?

24       A.    Like a week later.  I don't know what happened.

25   Because Mr. Garcia accused me --

1    Q.    When did you speak to Mr. Fanning?

2    A.    The same day.  He accused me.  I didn't take that

3    poster down.

4    Q.    Did you ask Mr. Fanning to do anything else?

5    A.    No.  I don't remember telling him -- asking him.

6    Q.    Did you file an OEO complaint regarding this?

7    A.    Not about the Malcolm X thing.

8    Q.    Did you mention this in any of your OEO

9    complaints?

10   A.    No.

11   Q.    Why not?

12   A.    I don't know.  I just didn't.

13            MR. RENAGHAN:  All right.  Can we go off the

14            record briefly?

15            (Whereupon, an off-the-record discussion was

16            held.)

17   Q.    All right.  We've discussed a number of

18   allegations of actions that you believe were discriminatory

19   and statements and actions that you believe created a

20   hostile work environment today.  Are there any other

21   actions that we haven't discussed?

22   A.    Well, does treating -- being treated very

23   unfairly, does that go into hostile work environment?

24   Being placed in the -- in the conditions that I was --

25   Q.    Just what specifically are you referring to?

M. BASTIAN

1    A.    The treatment.  The maltreatment.  Being placed

2  in a room with no air, being moved around to different

3  administrators with my qualifications, having people hired

4  in front of me who did not have my level of experience.

5    Q.    Okay.  But I believe we --

6    A.    I don't know.  I'm asking --

7    Q.    Did we not discuss those earlier?

8    A.    I was asking, is that being covered under --

9  because you asked me is there anything else.  I didn't

10  know.

11    Q.    Anything other than what we've discussed today.

12    A.    Oh, no.

13    Q.    So I just want to make sure that there isn't

14  another event that we didn't discuss today, so --

15    A.    Okay.  I just wanted to be clear.

16         MR. BELDNER:  She didn't know whether that

17         stuff would be considered under the hostile work

18         environment, which is what --

19         MR. RENAGHAN:  Okay.

20         THE WITNESS:  Yes.  I'm sorry.  I didn't say

21         it properly.

22         MR. SULLIVAN:  I think that's what she's

23         testifying.

24    Q.    Yeah.  So maybe we'll break this out to be a

25  little bit more clear.  So we discussed another -- a number

1    of actions this morning that I believe your claims of

2    employment discrimination are based upon.

3            Are there any other actions that we didn't get to

4    that we didn't discuss that you're claiming?

5    A.    No.

6    Q.    And then I think it was mostly this afternoon we

7    discussed a number of statements and actions that I believe

8    you're claiming were discriminatory in creating a hostile

9    work environment?

10   A.    Yes.

11   Q.    Are there any statements or actions that we

12   didn't discuss that you believe contributed to that?

13   A.    No.  I believe we covered it.

14   Q.    Now, this morning you also mentioned that you

15   believe that age was also a basis --

16   A.    I do.

17   Q.    -- a reason for your discrimination?

18   A.    I did say that earlier this morning.

19   Q.    I don't believe that any of the actions we

20   covered, when asked, you said were based on age; is that

21   correct?

22   A.    That is correct.

23   Q.    Are there any actions that you believe that were

24   based on age?

25   A.    No, sir.  I would like to remove that from the

1    record.

2        Q.     Okay.  So you don't believe that you were

3    discriminated against based on age?

4        A.     No, sir.

5               MR. RENAGHAN:  All right.  I think at this

6               time we'll break for the day.

7                      (Whereupon, at 5:18 P.M., the examination of

8               this witness was concluded.)

9

10

11                          MELISSA BASTIAN

12

13    Subscribed and sworn to before me

14    this _____ day of _____ 20___.

15

16    _____

        NOTARY PUBLIC
17

18

19

20

21

22

23

24

25

1                C E R T I F I C A T E

2

STATE OF NEW YORK        )
                         :  SS.:
3
COUNTY OF KINGS          )

4

5                I, STACY TEPLER, **(1-80, 178)**, a Notary Public

6    for and within the State of New York, do hereby certify:

7                That the witness whose examination is

8    hereinbefore set forth was duly sworn and that such

9    examination is a true record of the testimony given by that

10   witness.

11               I further certify that I am not related to any

12   of the parties to this action by blood or by marriage and

13   that I am in no way interested in the outcome of this

14   matter.

15               IN WITNESS WHEREOF, I have hereunto set my hand

16   this 18th day of August 2014.

17

18                        _Stacy Tepler_

19               _____

20                        STACY TEPLER

21

22

23

24

25

1              C E R T I F I C A T E

2

STATE OF NEW YORK        )
3                            :  SS.:
COUNTY OF KINGS          )

4

5              I, ANNA VORTSMAN, **(81-177, 179)**, a Notary

6    Public for and within the State of New York, do hereby

7    certify:

8              That the witness whose examination is

9    hereinbefore set forth was duly sworn and that such

10   examination is a true record of the testimony given by that

11   witness.

12             I further certify that I am not related to any

13   of the parties to this action by blood or by marriage and

14   that I am in no way interested in the outcome of this

15   matter.

16             IN WITNESS WHEREOF, I have hereunto set my hand

17   this 18th day of August 2014.

18

19                 *Anna Vortsman*
                    ─────────────────────
20                       ANNA VORTSMAN

21

22

23

24

25